NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0500n.06

**Nos. 10-1103, 10-1843**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

KEVIN ERWIN,
MARK ALLEN SAMUELS,

      Defendants-Appellants.

_____ /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

**FILED**

*Jul 20, 2011*

LEONARD GREEN, Clerk

BEFORE:     KEITH, CLAY, and COOK, Circuit Judges.

**CLAY, Circuit Judge.** Co-Defendants Kevin Erwin and Mark Allen Samuels were convicted of offenses stemming from their involvement in a multi-state scheme to defraud Bank of America out of approximately $750,000. Erwin pleaded guilty, pursuant to a written plea agreement, to wire fraud in violation of 18 U.S.C. § 1343, and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and (c)(5). Samuels pleaded guilty, without the benefit of a plea agreement, to bank fraud in violation of 18 U.S.C. § 1344, wire fraud in violation of 18 U.S.C. § 1343, aggravated identity theft in violation of 18 U.S.C. § 1028A, and conspiracy in violation of 18 U.S.C. §§ 371 and 1349. Both Defendants now appeal their sentences.

For the reasons set forth herein, we **AFFIRM** the sentences imposed upon Defendants Erwin and Samuels by the district court.

## BACKGROUND

### I.      Criminal Conduct

In mid-2007, Defendant Kevin Erwin and approximately one dozen other individuals from Oakland, California, began implementing a scheme to defraud Bank of America ("BOA") of more than three-quarters of a million dollars. In June of 2008, Defendant Mark Allen Samuels joined that scheme as a supervisor.

The scheme operated as follows: Erwin cultivated contacts at Kaiser Hospital in California and a local BOA branch. Those contacts supplied Erwin with identity information of current BOA customers. Using this information, Erwin created false identity documents that he supplied to his co-conspirators.[1]

Erwin and his co-conspirators, operating in small teams, would then organize trips to various locations throughout the United States, including South Carolina, Florida, Virginia, Missouri, Kansas, Pennsylvania, New Mexico, Connecticut, Maryland, Rhode Island, Michigan and Washington, D.C. Once in those locations, the teams would enter BOA branches and request a withdrawal of money from the accounts for which they held false identification. In order to ensure that those accounts contained sufficient funds, the team would call the BOA contact to verify the account balances. The team members who physically entered the branch offices—the

---

[1]Erwin used checks written by patients to Kaiser Hospital to identify BOA account holders. (Erwin PSR at ¶ 20.) In addition to producing false IDs, Erwin also produced fraudulent credit cards with the information that he obtained from Kaiser and BOA. (*Id.*)

"walkers"—would then meet with the trip supervisor, who would distribute the proceeds gained from the fraudulent withdrawals.

In addition to paying the walkers, each team supervisor was responsible for organizing the logistics of the trips that he supervised. These duties included booking airfare and lodging for all team members, and providing for food, travel, and incidental expenses while on site. Furthermore, the supervisors were responsible for targeting the bank branches that the teams would attempt to defraud. Having identified a weakness in BOA's systems integration, the teams looked for branches of other banks that had recently been taken over by BOA and were unusually vulnerable. Lastly, team supervisors also coordinated any given day's activities, by mapping out which banks the teams would visit.

Using this structure, the teams successfully withdrew $726,726.18 from BOA accounts between May 10, 2006 and January 8, 2009.[2]

On January 8, 2009, eight BOA branches in and around Grand Rapids, MI, reported several fraudulent withdrawals, made by individuals with California identification, to BOA's internal fraud investigation department. The next day, employees at a BOA branch in Wyoming, MI called local police after refusing to allow one of the walkers to withdraw money from an account. Those employees provided local officers with a description of the walkers' vehicle, which officers located and traffic stopped. The four people in the vehicle were arrested for identity theft and bank fraud.

---

[2]Defendants attempted to withdraw an additional $59,641.47, bringing the total attempted and actual loss to $786,367.65. BOA's total loss was $707,526.18.

The local officers contacted the United States Secret Service, which assisted in the investigation. Agents searched the car and the local hotel where the team was lodged. They found, among other items, approximately two dozen fraudulent identification documents, 18 counterfeit credit cards, lists of bank account numbers, various electronics (including laptops, cell phones, and global positioning system ("GPS") units), screen prints of checks, and $16,300.00 in cash.

While in jail, a co-conspirator made a telephone call to Defendant Samuels in which he told Samuels about the arrest and instructed him to "clean it up," "sweep the house," and "shut it down." Another jailed co-conspirator later made a call to Samuels in which they discussed the scope of the conspiracy, including an earlier trip to Michigan made by a different team, and the co-conspirator warned Samuels that the investigation was expanding outside of Michigan.

## II.    Indictment and Pleas

On February 18, 2009, Samuels was arrested in California. Erwin was arrested, also in California, on February 26, 2009. Both were remanded to federal custody and transported to Michigan. On March 19, 2009, Erwin and Samuels were added, by way of a first superseding indictment, to a four count indictment filed in the Western District of Michigan. The indictment charged: I) conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 371 and 1349, for acts committed in the Western District of Michigan between May 31, 2007 and January 9, 2009; II) bank fraud in violation of 18 U.S.C. § 1344, for acquiring fraudulent identification documents and using them to make fraudulent cash withdrawals; III) wire fraud in violation of 18 U.S.C. § 1343, for use of the internet and GPS units in the commission of fraud; and IV) aggravated

4

identity theft in violation of 18 U.S.C. § 1028A, for using the names, dates of birth, and social security numbers of certain individuals to commit wire and bank fraud.[3]

On October 13, 2009, Erwin pleaded guilty to wire fraud and aggravated identity theft, as charged in the second superseding indictment, pursuant to a written plea agreement. Erwin agreed to cooperate with law enforcement; in exchange, the government agreed to move to dismiss the remaining charges, not oppose Erwin's motion for an acceptance of responsibility reduction, and evaluate Erwin for a § 5K1.1 reduction for substantial assistance. On November 12, 2009, Samuels pleaded guilty to all four counts as charged in the second superseding indictment, without the benefit of a plea agreement.

### III.    Sentencing—Erwin

Erwin's sentencing hearing was held on January 13, 2010. Pursuant to recommendations in his Presentence Investigation Report ("PSR"), Erwin's base offense level was set at 7. Erwin received a 14-level enhancement for a loss of more than $400,000 but less than $1,000,000, pursuant to United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 2B1.1(b)(1)(H); a two-level enhancement for the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(C); and a four-level enhancement for being an organizer of leader in the offense, pursuant to U.S.S.G. § 3B1.1(b). He received a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. Therefore, his adjusted offense level was calculated to be 24.

---

[3]The second superseding indictment was filed on April 23, 2009, adding additional defendants and including new allegations of overt acts occurring in the Western District of Michigan. On October 22, 2009, a third superseding indictment was filed, which did not include Erwin.

Erwin had 11 criminal history points. Because only four of his five one-point convictions could be counted toward his criminal history, pursuant to U.S.S.G. § 4A1.1(c), his subtotal was reduced to 10 points. Erwin received two additional points for committing the instant offense while on probation. Therefore, Erwin had a total of 12 criminal history points, which equated to a Criminal History Category V. His recommended Guidelines range of imprisonment was 92 to 115 months on Count III, with a consecutive 24 month term of imprisonment on Count IV, for a total range of 116 to 139 months.

At sentencing, the government moved for an upward departure to Criminal History Category VI. The district court granted the motion, finding that Erwin's criminal history category substantially under-represented his criminal background and likelihood of recidivism. Erwin's recommended Guidelines sentence was thereafter calculated to be 100 to 125 months of imprisonment (non-inclusive of the 24 months for Count IV). The district court sentenced Erwin to 120 months on Count III and 24 months on Count IV, for a total of 144 months of incarceration. The judgment of the district court was entered on January 15, 2010.[4]

## IV.    Sentencing—Samuels

Samuels' sentencing hearing was held on June 16, 2010. Pursuant to recommendations in his PSR, Samuels' base offense level was set at 7. Samuels received a 14-level enhancement for a loss of between $400,000 and $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H); a two-level enhancement for the use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(C); and a three-

---

[4]The district court entered an amended judgment on January 29, 2010, clarifying the restitution imposed.

level enhancement for a managerial or supervisory role in the offense, pursuant to U.S.S.G. § 3B1.1(b). He received a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. This yielded an adjusted offense level of 23.

Samuels' criminal history corresponded to a Criminal History Level IV, which together with Samuels' adjusted offense level of 23, produced a recommended Guidelines sentencing range of 70 to 87 months of incarceration. Samuels was also subject to a 24 month term of incarceration on Count IV, under 18 U.S.C. § 1028A(a)(1), to run consecutively to any other sentence imposed.

The district court sentenced Samuels to 87 months on Counts I through III, collectively, and 24 months on Count IV, for a total sentence of 111 months of incarceration.[5] The judgment of the district court was entered on June 17, 2010.

Both Defendants now appeal.

## ANALYSIS

### I.       Reasonableness of Erwin's Sentence

#### A.       Standard of Review

This Court "review[s] a district court's sentencing determination, under a deferential abuse-of-discretion standard, for reasonableness." *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (internal quotations omitted). On appeal, we generally review a sentence imposed by the district court for both procedural and substantive reasonableness. *See United States v. Smith*, 516 F.3d 473, 476 (6th Cir. 2008).

---

[5]Co-defendant Alonzo Lamar Holloway, the third supervisor in the scheme, pleaded guilty to all four counts of the second superseding indictment. He was sentenced to 108 months of imprisonment on Counts I through III, and 24 months on Count IV, to be served consecutively.

Erwin challenges only the substantive reasonableness of his sentence. Therefore, we need not review for procedural reasonableness. *See United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008). "Substantive reasonableness turns on whether the length of the sentence is unreasonable because the sentencing court 'select[ed] the sentence arbitrarily, bas[ed] the sentence on impermissible factors, . . . or [gave] an unreasonable amount of weight to any pertinent factor.'" *United States v. Brown*, 579 F.3d 672, 677 (6th Cir. 2009) (quoting *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)). Sentences within the advisory Guidelines range are afforded a rebuttable presumption of reasonableness, *see Rita v. United States*, 551 U.S. 338, 347 (2007), but we will not draw a negative presumption against sentences that fall outside of that range. *See Tate*, 516 F.3d at 469-70.

"[A] district court's decision to exercise its discretion to depart from the advisory Guidelines, either upward or downward, is reviewed for reasonableness." *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009). This Court accords substantial deference to such decisions, as "questions concerning sentencing departures necessarily address the district court's 'refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.'" *Id.* at 583 (citing *United States v. Pluta*, 144 F.3d 968, 977 (6th Cir. 1998).

Erwin argues that his sentence is substantively unreasonable because "[h]is advisory sentencing range was based on a Guideline calculation which . . . included three points of criminal history which arose out of a conviction which was barely within the 15-year window required by the Sentencing Guidelines to count . . . [which] resulted in an over-statement of Mr. Erwin' criminal

history." (Erwin Br. at 9.) Erwin also argues that his "sentence contravenes 18 U.S.C. § 3553(a)(6) and the mandate to avoid unwarranted sentencing disparity" because it is 12-months longer than the sentences imposed on any of his co-defendants. (*Id.*)

## B. Weight of Criminal History

Erwin's PSR identified 19 prior adult convictions and 16 additional arrests and prosecutions. Seven of these convictions were counted toward Erwin's criminal history for the purposes of sentencing in this offense; the remaining twelve were not counted because they were too dated. The scored convictions were: transporting, possessing and selling narcotics (3 points); transporting and selling narcotics (3 points); burglary (1 point); receiving stolen property (1 point); obtaining and possessing a credit card without cardholder's consent (1 point); possessing or selling personal information to establish false status or identity (1 point); and driving under the influence of alcohol (1 point).

At sentencing, the district court identified Erwin's "repeated convictions for a whole bevy of offenses including drug crimes, including lesser crimes for sure, but then including a series of fraud crimes." (Erwin Sent. Tr. at 70.) It further highlighted the trend in Erwin's history of receiving "progressively increasing punishments," which had "done nothing to deter the law-breaking conduct." (*Id.*) Lastly, it noted that Erwin's PSR reflected "a history of basically 25 years of law-breaking and no history of law-abiding activity." (*Id.*) Having reviewed these considerations, the district court "conclude[d] that the criminal history calculation substantially underrepresents either the seriousness of [Erwin's] criminal history or the likelihood of recidivism." (*Id.* at 67-68.)

Erwin now argues that the three points that he was assessed for a conviction for transporting, possessing and selling narcotics, for which he served a sentence between 1991 and 1994, was "obviously considered far too strongly by the court" in reaching its sentencing determination. (Erwin Br. at 12.) This is because, while that offense conduct "barely made it in" to the 15-year criminal conduct window mandated by U.S.S.G. § 4A1.2(e), it accounted for three of the 12 criminal history points that Erwin was assessed, which he argues is imbalanced with its relative importance. (*Id.* at 7-8.) Erwin argues that in imposing sentence without re-weighing the relative importance of his prior convictions, the district court erred in not recognizing its "wide latitude in imposing sentence and the fact that sentences must be tailored to defendants and do not depend on the Guidelines for ultimate support." (*Id.* at 13.)

The government responds that "the record thoroughly supports its finding that Defendant had been breaking the law since he was 18, had shown no sign of changing his ways, and had proven impervious to the deterrent of increasingly longer sentences." (Pl.'s Br. at 18-19.) Therefore, the government contends, "the district court could, and did, correctly conclude that [Criminal History Category] V did not reflect the likelihood of Defendant's recidivism, and that the need to protect the public warranted treating him as a [Criminal History Category] VI instead of a [Criminal History Category] V." (*Id.*)

> An upward departure may be taken under the following circumstance:
>
> If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted.

U.S.S.G. § 4A1.3(a)(1)

10

An upward departure under this section does not represent a deviation from the guidance provided by the Guidelines; instead this Court has held that "a departure is expressly encouraged under § 4A1.3 where the recommended sentencing range does not adequately account for the defendant's past criminal conduct." *Herrera-Zuniga,* 571 F.3d at 583 (internal quotations omitted).

As an initial matter, it should be noted that the district court clearly *considered* Erwin's criminal history and made an individually tailored decision about the relative weight to give to his prior offenses. That the district court recognized its "wide latitude in imposing sentence" is proven by the fact that it determined that a departure based on Erwin's criminal history was warranted—albeit it an upward departure.

Because the scored offenses underlying the calculation of a Criminal History Category V for Erwin only extended back 15 years, they did not clearly reflect the fact that Erwin had never had a significant period of time elapse during his adult life when he was free from crime. The limited scored offenses also failed to illustrate Erwin's propensity to commit the same kinds of crimes—involving stolen property, stolen identities, and drug offenses—over and over again. This pattern directly implicates the probability of Erwin reoffending, which the district court addressed. (Erwin Sent. Tr. at 70.) Finally, the extent of Erwin's criminal history, and the seeming failure of previous punishment to deter him from committing further crimes, also supports the district court's conclusion that upward departure was warranted.

Having reviewed Erwin's record, it is clear that the district court reasonably determined, "in light of all the facts and circumstances of the particular case before it, whether the range in question

[was] appropriate to the case." *United States v. Brown*, 371 F.3d 854, 860 (6th Cir. 2004) (internal quotations omitted). This Court will not disturb that determination.

### C.    Disparity Among Sentences of Co-Defendants

Erwin argues that "the district court abused its discretion and imposed an unreasonable sentence by sentencing [him] to 12 years of incarceration when it sentenced Mr. Holloway and the other co-defendants to less . . . . It is further unreasonable because it contravenes 18 U.S.C. § 3553(a)(6) and the mandate to avoid unwarranted sentencing disparity." (Def.'s Br. at 16.)

In response to Erwin's latter argument, the government counters, correctly, that "'[a] district judge is not required to consider the disparity between the sentences of co-defendants.'" (Pl.'s Br. at 14 (quoting *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010).) Responding to Erwin's argument that the district court generally abused its discretion in imposing disparate sentences among the co-defendants, the government asserts that "the question is not whether Defendant's sentence is in fact disproportionate to that of Alonzo Holloway, but only whether the district court considered Defendant's argument that he should not receive a longer sentence than Holloway." (*Id.* at 15.)

The government, again, takes the correct position. A district court's consideration of disparity amongst co-defendants' sentences is completely discretionary. *See United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007). Because Erwin raised the issue of the disparity between his and Holloway's sentences before the district court, the court was obligated to consider the argument if it felt that it was not frivolous. *See, e.g., United States v. Gale*, 468 F.3d 929, 939-40 (6th Cir. 2006). But "discretionary factors are not even appealable when discretion is requested and

12

the judge refused or did not depart as far as the defendant wanted so long as the judge appreciated his discretion to downwardly depart." *Simmons*, 501 F.3d at 624.[6]

A review of the sentencing transcript shows that the district court did consider that it was imposing upon Erwin a sentence "12 months longer than Mr. Holloway's." (Erwin Sent. Tr. at 68.) The district court described, at some length, its rationale in imposing a longer sentence upon Erwin than on other co-defendants, including Holloway:

> Things that are instrumental in the Court's mind are, number 1, that multiple parties have indicated in their presentence report proffers that both Mr. Erwin and for that matter Mr. Holloway did act as supervisors on the trips they took. Paragraph 77 and 78 [of the PSR] talks about Mr. Erwin getting money on those trips. And in fact Mr. Holloway in that particular paragraph or set of paragraphs, I think it's 78, indicates that the money would be turned over to Mr. Erwin on the return trip.

> More than that, paragraph 82 indicates that Mr. Erwin was paid separately for documents. It was simply a fee for documents, if you will, which . . . [is] unique among the codefendants.

> . . . .

> And similarly it appears that Mr. Erwin was the person who had the inside source, Ms. Aldridge, at Bank of America. Those documents and the inside source were critical, essential elements to this crime. It could not have been done without it. . . . I put both [Holloway and Erwin] in the same tier of what the government has characterized in its briefing as tier 1. But I do think that Mr. Erwin's participation was still incrementally more aggravating within the meaning of the guidelines as an organizer or leader because he had access to two critical bits of information, two critical things, without which this could not have happened. . . . He had the source on the inside, and he had the ability and wherewithal to make the phony documents.

---

[6]While Erwin frames this as a substantive reasonableness challenge, it is instead a challenge to the district court's procedural reasonableness, as the claim goes to "the factors evaluated and the procedures employed by the district court in reaching its sentencing determination." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir.2005).

(*Id.* at 40-41.)[7]

Erwin offers no reason why the district court, having considered the relative roles of all co-conspirators and found that Erwin's role was more significant and integral to the scheme than that of any of his co-defendants, should not have sentenced him in the manner that it did.

Because "[c]onsidering uniformity between co-defendants' sentences . . . is not required by the Sentencing Guidelines or the § 3553(a) factors," *Simmons*, 501 F.3d at 623, and because the district court considered the disparity between co-defendants' and Erwin's sentences, and presented a reasonable rationale therefor, the district court did not abuse its discretion.

### D.      Summary

For these reasons, the district court did not abuse its discretion in determining that an upward departure was warranted pursuant to U.S.S.G. § 4A1.3; nor was it substantively or procedurally unreasonable to sentence Erwin to a 12-month longer term of incarceration than any of his co-defendants.

### II.      Calculation of Samuels' Sentence

### A.      Attribution of Loss Amount

Samuels argues that the district court erred when it held him responsible for more than $400,000 in loss, based on the amount fraudulently obtained (or attempted) by all members of the

---

[7]The district court stated that it found "a sentence that's incrementally greater than Mr. Holloway's . . . is appropriate and justifiable on the facts and the circumstances of the case" under the same analysis that it "found a four-point enhancement appropriate for Mr. Erwin . . . as compared to the three points for Mr. Holloway." (Erwin Sent. Tr. at 75.)

scheme from the time that Samuels joined in July of 2008.[8]  Because he was "not involved in the planning, execution, or sharing of proceeds from fraud trips led by other defendants," he contends that "[h]is offense level should therefore be increased only by 10 levels for losses between $120,000 and $200,000 under § 2B1.1(b)(f) from the trips for which he was responsible." (Samuels Br. at 6.)[9]

We "review *de novo* the district court's method of calculating loss for purposes of sentencing enhancements under the Guidelines." *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007). "Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006).  In determining the amount of loss attributable to a defendant, the district court may not "blindly embrace[] the figures set forth in [a defendant's] PSR . . . . Rather, the district court must actually find facts." *White*, 492 F.3d at 416.

Under U.S.S.G. § 1B1.3(a), offense level and characteristics are determined in relation to certain relevant conduct, including:

---

[8]Samuels does not challenge the mathematical calculation that the district court used in reaching a dollar figure for attempted loss from all co-conspirators post-June 2008.

[9]Samuels' math is somewhat difficult to follow.  Samuels' PSR, as he points out, only reports his having personally traveled on one trip, from October 15-18, 2008.  The total attempted loss for that trip was $81,427.79 and the actual loss $73,927.79.  (Samuels PSR ¶ 88.)  Though the trip that Samuels directly participated in generated an attempted loss of between $70,000 and $120,000—equating to an 8-level increase—Samuels "maintain[s] that he should be held accountable for under $200,000," (Samuels Br. at 7), because "he personally received no more than $150,000 from the criminal activity he jointly undertook with others." (Samuels Sent. Memo at 2.) How Samuels could have received $150,000 from the one trip in which he participated, which grossed only $74,000, is inexplicable.

in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonable foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B).

We have held that U.S.S.G. § 1B1.3(a)(1)(B) "requires that the district court make particularized findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

It is Samuels' position that the district court did not make particularized findings as to the scope of his agreement with co-conspirators, and that furthermore, the record does not support the finding that Samuels was jointly involved in the trips that he did not personally attend. (Samuels Br. at 9.) Samuels further argues that the conduct of his co-conspirators was not foreseeable, as he "was [not] involved in any way whatsoever in the separate fraud trips conducted by Defendants Holloway and Erwin, the other two leaders in this triple conspiracy." (*Id.*)

The district court made the following specific factual findings regarding the scope of Samuels' participation in the criminal enterprise—"that no later than July of 2008 Mr. Samuels has joined this particular conspiracy" and:

> there's no question that Mr. Samuels operated at a higher level, at a planning level, at a level that warrants responsibility for the entire operation that occurred on his watch. And I think in Mr. Samuels' case that includes trips certainly that he went on and also includes trips that he didn't go on but that other people, in particular Mr. Holloway or Mr. Erwin, were personally supervising. And that's because in my view Mr. Samuels on this presentence record was somebody who was intimately involved once he got into the conspiracy in the planning, execution, implementation, and then

16

ultimately the attempt to clean it up . . . . And I think the evidence on this point is particularly telling and supportive of an inference that, certainly by a preponderance of the evidence, Mr. Samuels' role is at that high level.

(Samuels Sent. Tr. at 59-60, 63.)  The district court noted that Samuels had introduced other participants, who went on trips that he did not supervise, to the conspiracy.  (See *Id.* at 64.)  The district court found this to be an additional indication that Samuels was intertwined in the entire enterprise, not just the trips that he attended.  (See *Id.*)

The district court also credited the proffers offered by many of Samuels co-conspirators, which repeatedly indicated that Samuels was a leader in the conspiracy and performed an "identical" role to Holloway and Erwin, the other supervisors.  (See *Id.* at 59.)  This role was greater than that of the walkers, who were only involved in and responsible for the trips that they attended, and extended to the whole of the scheme.  (See *Id.* at 57-58.)

Regarding foreseeability, in addition to the foregoing, the district court found that the evidence of co-conspirators' jailhouse calls to Samuels after the arrest supported to the conclusion that Samuels was aware of the conduct of all of the teams.  (See *Id.* at 60-61.)  When arrested, several co-conspirators called Samuels, and during these conversations Samuels discussed not only trips that he personally supervised, but also trips that other supervisors led.  (See *Id.* at 64; Samuels PSR ¶ 50.)  He discussed "cleaning" up whatever evidence of the conspiracy might be in California; presumably not just evidence of his own trips (which his co-conspirators would have no reason to tell him to clean up), but evidence of the operation as a whole.  (Samuels Sent. Tr. at 64; Samuels PSR ¶ 48.)  The co-conspirator also told Samuels that Erwin wanted him to "shut it down," which again speaks to the conspiracy as a whole and not just to Samuels' own trips.  (Samuels PSR ¶ 49.)

Samuels replies that the district court's findings were nonetheless insufficiently particularized, as "the district court failed to distinguish the three conspiracies in this case and determine the separate losses caused by each group." (Samuels Reply at 1.) This argument fails for two reasons: first, the district court properly found that there was only a single conspiracy, which Samuels joined in 2008; and secondly, because the walkers worked for different supervisors' teams at different times, and because supervisors sometimes traveled on the teams together, it would be impossible to separate out "three conspiracies" in the way that Samuels seems to envision. (*See* Samuels PSR ¶ 88.)

There is no evidence in the record to undermine the conclusion that Samuels was a supervisor in the single conspiracy from June 2008 forward, and that all activity after that point was jointly undertaken within the meaning of U.S.S.G. § 1B1.3(a)(1)(B). The district court made particularized findings regarding both the scope of Samuels participation and the foreseeability of his co-conspirators' actions, and those findings are supported by a preponderance of the evidence. Therefore, the district court did not err in assessing Samuels a 14-level enhancement.

### B.       Enhancement for the Use of Sophisticated Means

We review the district court's application of the Guidelines for clear error. *See United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996).

The district court determined that Samuels qualified for a two-level sentencing enhancement, pursuant to U.S.S.G. § 2B1.1(b)(9), for the use of sophisticated means. The Guidelines defines "sophisticated means" as:

> [E]specially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme,

locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 cmt. n.8 (2008).

While Samuel acknowledges that "he arranged or 'sponsored' some of the [fraud] trips . . . purchased false identifications, recruited persons to go on the trip, scheduled the flights, and located the banks to hit," he claims that the district court committed clear error in applying the enhancement to his sentence. (Samuels Br. at 2) Samuels argues that sophisticated means, if any, were only used in the commission of Count IV, for which no enhancement can be applied.

The government responds that Samuels' efforts to minimize the complexity of the operation by examining each aspect of the scheme piecemeal—e.g., booking airfares or locating bank branches—obscures the fact that the combination of all of these activities required extremely sophisticated planning. Therefore, as "Defendant's objection asks the Court to focus on one aspect of the offense instead of the totality of the scheme, it should be overruled." (Pl.'s Br. at 20.)

Samuels is correct that the charged activities of Count IV cannot be used to enhance his sentence for Counts I through III. The Guideline addressing aggravated identity theft states:

> If a defendant was convicted of violating 18 U.S.C. § 1028A, the guidelines sentence is the term of imprisonment required by statute. Chapters Three (Adjustments) and Four (Criminal History and Livelihood) shall not apply to that count of the conviction.

U.S.S.G. §2B1.6(a).

There is no question that the district court did not directly apply any enhancement to the 24-month sentence it imposed upon Samuels on Count IV. Instead, Samuels argues that, in applying

19

an enhancement to his sentences for Counts I through III, the district court used only the factual basis underlying Count IV.

On the contrary, the district court found that "this situation involves a whole variety of sophisticated means and that go well beyond the Count IV, aggravated identity theft, which certainly involved sophisticated means." (Samuels Sent. Tr. at 65.) The district court continued:

> [The conspirators] picked out locations across the country as opposed to concentrating all their efforts in one place. . . . and it's probably one of the things that allowed the conspiracy to thrive as long as it did. And certainly sophisticated means include efforts taken not just to commit the offense but to conceal the offense as well.
>
> Another, it seems to me, obvious sophisticated means is the whole description of how Mr. Samuels handled proceeds by depositing it into an account of a daughter, not his own personal account, and then using increments that are below the reporting threshold of $10,000. That seems to me a well-known means among people who understand the banking system to conceal or at least slow down the path of law enforcement. And it's happened here. I think the only reasonable inference is that it was part of an effort, successful for a while, to conceal what was going on.
>
> The third and certainly the most obvious sophisticated means, it seems to me, is the logistical planning involved. Flying in your own name with legal lawful documents is hard enough these days. To do it with false documents, to do it across the country, to coordinate the trips of multiple players, and to include housing and everything else that goes along with that, rental cars, this is a group of people whose logistical skills are quite remarkable, it seems to me, and that was necessary to conceal the fraud as long as it went on.

(*Id.* at 66-67.)

Each of these activities was charged under Counts I through III. Count II charged that the co-conspirators "traveled to the Western District of Michigan and other states where they used [counterfeit] documents to make fraudulent, in-person cash withdrawals of approximately $211,319 from the BOA accounts of those persons, resulting in a financial loss to BOA of approximately $174,585." (Samuels PSR ¶ 5.) This kind of cross-jurisdictional conduct, for the purposes of

avoiding detection, is exactly the type of conduct described in the Guidelines definition of "sophisticated means." *See* U.S.S.G. § 2B1.1 cmt. n.8 (2008).

Count III charged that "defendants used the Internet to determine the addresses of BOA branches for the purpose of committing bank fraud and aggravated identity theft. They also used a GPS to assist in locating bank branches, lodging, and otherwise traveling as necessary to carry out the scheme." (*Id.* ¶ 6.) This count addresses the complicated logistics involved in targeting the banks "to hit." It also encompasses the sophistication required to target out-of-state banks in transition onto BOA systems, which the conspirators identified as being particularly vulnerable to their kind of fraud. (Samuels Sent. Tr. at 11-12.)

Furthermore, Samuels' structuring of deposits into his daughter's bank account was an attempt to cover up not the crime of identity theft, but to cover up his participation in a bank fraud conspiracy, as charged under Counts I through III. This Court has held that such funneling of transactions through relatives in order to disguise the origin of funds is sufficient to support an enhancement for sophisticated means. *See United States v. May*, 568 F.3d 597, 607 (6th Cir. 2009) (citing *United States v. Clear*, 112 F. App'x 429, 431 (6th Cir. 2004)).

Just as in *United States v. Masters*, "[w]hile each of the individual steps in the fraud scheme was not particularly sophisticated, it is the totality of the defendant's conduct—the entire scheme—that the district court found was carried out using 'sophisticated means." 216 F. App'x 524, 527 (6th Cir. 2007). In determining that Samuels' offense conduct under Counts I through III involved the use of sophisticated means, the district court did not commit clear error.

**CONCLUSION**

21

The district court neither abused its discretion nor committed error in sentencing Defendants Erwin and Samuels.  We therefore **AFFIRM** the sentences imposed upon Defendants Erwin and Samuels by the district court.