RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0053p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

_Plaintiff-Appellee,_

_v._

KATHRYN SUE SIMMERMAN,

_Defendant-Appellant._

No. 16-1019

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cr-00127—Robert Holmes Bell, District Judge.

Argued: January 24, 2017

Decided and Filed: March 9, 2017

Before: MERRITT, CLAY, and DONALD, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Donald A. Davis, SPRINGSTEAD BARTISH & BORGULA LAW,PLLC, Grand Rapids, Michigan, for Appellant. Clay Stiffler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Gary K. Springstead, SPRINGSTEAD BARTISH & BORGULA LAW,PLLC, Fremont, Michigan, for Appellant. Clay Stiffler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

BERNICE BOUIE DONALD, Circuit Judge. The appellant, Kathryn Simmerman, pled guilty, pursuant to a plea agreement, to one count of embezzling $1,528,000 from Shoreline Federal Credit Union (Shoreline), in violation of 18 U.S.C. § 657 (Count 1), and one count of

structuring the deposits of the money she stole to evade the reporting requirements of 31 U.S.C. § 5313(a), in violation of 31 U.S.C. § 5324(a)(3) and (d)(1) (Count 2). The district court assessed Simmerman's total offense level to be 28, based on a base offense level of seven, a sixteen-level increase for a loss amount between $1 million and $2.5 million, a two-level increase for sophisticated means, four-level increase for jeopardizing the soundness of a financial institution, a two-level increase for abuse of a position of trust, and a three-level reduction for acceptance of responsibility and a timely plea. With a criminal history category of I, Simmerman's guideline range was 78-97, months and she was sentenced to 78 months on Count 1 and 60 months on Count 2, to be served concurrently. Simmerman raised the following issues on appeal: whether the district court's sentence was in error because it assessed enhancements for (1) sophisticated means (U.S.S.G. § 2B1.1(10)(C)); (2) jeopardizing the soundness of a financial institution (U.S.S.G. § 2B1.1(b)(16)(B)(i)); and (3) abuse of a position of trust (U.S.S.G. § 3B1.3). Because the district court was not clearly erroneous when it assessed the sentencing enhancements, we **AFFIRM** the district court's decision.

I.

In 1987, at the age of twenty-six, Simmerman began working at Shoreline. In 2000 she became assistant manager, and in 2006 she became Shoreline's manager. Simmerman was responsible for making investments and preparing Shoreline's financial statements, which she presented to Shoreline's part-time board, the National Credit Union Administration (NCUA), and Shoreline's auditors, Financial Standards Group. Simmerman was also responsible for taking cash from the vault each day and giving it to the credit union tellers so they could service customers. Simmerman admitted that she first began stealing money from Shoreline in 1998. Simmerman's acts were discovered during a routine annual audit in 2014.

Simmerman effected her scheme using the following method: Simmerman would remove cash from the "vault," a filing cabinet located within the credit union. She would use the "teller module," a computer program used by all employees to track monies within the credit union, to make an entry showing the amount of cash she had removed from the vault had been deposited into another teller's drawer. However, the drawer she deposited the stolen funds was a virtual, fictitious drawer denoted by a code not recognized by the system and which did not correspond

to an actual teller drawer.  Thus, the vault amount was accurately reflected as having been reduced, but because the teller module did not recognize the fictitious drawer designation, the deposit into the fictitious drawer was recorded by default into a "general ledger suspense account."  At the end of the day wherein she made one of these transfers, she made a manual entry suggesting that a transfer from the general ledger suspense account back to the vault had occurred in order to prevent the general ledger suspense account from growing noticeably.  This ensured that the amount of cash the teller module believed to be in the vault was actually correct, but meant that the general ledger balance would be overstated by the amount of cash she had taken.

To conceal the general ledger balance during audits, Simmerman prepared fictitious general ledger entries prior to the audits and decreased the amount reflected in the vault general ledger balance to match the amount of cash actually in the vault.  To balance the ledger, she made a corresponding increase in the general ledger entry reporting the amount of cash Shoreline had on deposit with its correspondent credit union, Alloya.  The auditors always performed a physical count of the amount of cash in the vault and compared it to the ledger balance.  Once the auditors had completed their physical count and compared the total to the general ledger balance, Simmerman would reverse the original journal entry and return the vault balance to the overstated amount.

Simmerman also directed Shoreline tellers to deposit some of the embezzled cash into Shoreline accounts belonging to herself, her husband, and her adult children (showing $116,592 in cash deposits into her husband's account, $475,975 into one adult son's account, and $39,000 into her other sons' account).  These deposits were in increments of less than $10,000 to avoid triggering currency transaction reports.  For example, on October 2, 2014, and October 7, 2014, Simmerman took $22,000 from Shoreline's vault, but spread out the deposits of that cash in thirteen separate transactions between October 2, 2014, and October 20, 2014, in amounts ranging from $100 to $7,000.  She also sometimes simply took money from the vault and put it in her purse.  At the time of her arrest, the general ledger balance was overstated by $1.945 million.

On July 29, 2015, Simmerman was charged with one count of embezzling $1,528,000 from Shoreline and one count of structuring deposits of the money she stole to evade reporting requirements.  On August 17, 2015, Simmerman pled guilty to both counts, pursuant to a plea agreement in which the government agreed to forbear from bringing charges against Simmerman's family related to their spending of the proceeds of the embezzlement.

## II.

In reviewing a district court's application of the Sentencing Guidelines, this court must "accept the findings of fact of the district court unless they are clearly erroneous and . . . give due deference to the district court's application of the guidelines to the facts."  18 U.S.C. § 3742(e). In light of *Buford v. United States*, 532 U.S. 59, 63-66 (2001), this court has held that our standard of review of a district court's application of provisions of the Sentencing Guidelines to the facts should be treated deferentially and should not be disturbed unless clearly erroneous. *See United States v. Jackson-Randolph*, 282 F.3d 369, 389-90 (6th Cir. 2002) (holding that the Supreme Court's reasoning in *Buford* leads to the use of a deferential standard of review in the application of the Sentencing Guidelines under circumstances involving fact-bound determinations).

## III.

i.    Sophisticated means

Section 2B1.1(b)(10)(C) of the guidelines calls for a two-point enhancement for use of sophisticated means. According to the Application Note, "sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9.  It further notes that, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id*.  Further, this court has held that the "funneling of transactions through relatives in order to disguise the origin of funds is sufficient to support an enhancement for sophisticated means." *United States v. Erwin*, 426 F. App'x 425, 437 (6th Cir. 2011) citing *United States v. May*, 568 F.3d 597, 607 (6th Cir. 2009).

The district court found that Simmerman used sophisticated means to conceal her crime. Although the government and Simmerman argued before the district court that Simmerman's embezzlement was not sophisticated because she simply took money out of the credit union vault, the district court found that Simmerman's *concealment* of her offense from auditors via the extensive manipulation of Shoreline's computer systems and financial records amounted to the use of sophisticated means. Transcript of Sentencing at 375-77, *United States v. Kathryn Sue Simmerman*, No. 15-CR-127 (W.D. Mich. March 10, 2016), ECF No. 30.

The district court was not clearly erroneous. The district court cited Simmerman's use of fictitious identification numbers and a dormant account ledger to avoid detection. *Id*. at 376. Simmerman also structured deposits of her embezzled cash and used family member's credit union accounts to hide her activity. Further, the presentence report contains more than three pages of dense, technical recitations of the complicated accounting machinations used by Simmerman to conceal her crime. This included the daily manipulation of Shoreline's computerized accounting system to balance the missing cash, the use of a dormant account to hide the money, the manipulation of the balance of the suspense account, and the movement of general ledger balances to and from the vault ledger before and after the accountants conducted their on-site visits.

Although Simmerman argues that the embezzlement was not sophisticated because she essentially took money and put it in her purse, the district court explicitly rejected that argument, finding that the concealment of the money was sophisticated and warranted the sentencing increase. This was not clearly erroneous. Simmerman's system of manipulating the computer system and creating a dormant account to hide the stolen money, and the various other methods she employed to evade detection, were sophisticated. Thus, the district court was not clearly erroneous when it assessed a sentencing enhancement for sophisticated means.

ii.     Safety and soundness of a financial institution

The Sentencing Guidelines provide that a defendant's offense level shall be increased by four levels if the offense "substantially jeopardized the safety and soundness of a financial institution." U.S.S.G. § 2B1.1(b)(16)(B)(i). The commentary contains the following

nonexhaustive list of factors for courts to consider when determining whether the enhancement applies: (1) "[t]he financial institution became insolvent"; (2) "[t]he financial institution substantially reduced benefits to pensioners or insureds"; (3) "[t]he financial institution was unable on demand to refund fully any deposit, payment, or investment"; (4) "[t]he financial institution was so depleted of its assets as to be forced to merge with another institution in order to continue active operations"; or (5) "[o]ne or more of the [foregoing] criteria . . . was likely to result from the offense but did not result from the offense because of federal government intervention, such as a 'bailout.'" U.S.S.G. § 2B1.1 cmt. n.13.

The district court found that there was a period where "the solvency of [Shoreline] was really in jeopardy" with a "net worth ratio [of] less than two percent." Transcript of Sentencing at 410. The district court further found that Simmerman's $1.945 million embezzlement represented a "substantial percentage of the entire asset[s]" of Shoreline and, thus, it was "substantially endangered" and "clearly in difficult straits from an asset liability standpoint." *Id.*

The district court finding was not clearly erroneous. Although Shoreline did not become financially insolvent, that is only one of the factors that the district court was guided to consider. However, even if it was a critical factor, other circuits have found that substantial jeopardy enhancements are appropriate even though a financial institution did not actually become insolvent. *See e.g. United States v. Zech,* 553 F.3d 663, 666-67 (8th Cir. 2009) (holding that a substantial jeopardy enhancement is appropriate even though the financial institution did not actually become insolvent); *United States v. Young*, 413 F.3d 727, 733 (8th Cir. 2005) (affirming application of the substantial-jeopardy enhancement when defendant's fraud caused a bank to become "critically undercapitalized" with a capital ratio of less than 2%). After discovering the embezzlement and accounting for the $1.945 million loss, Shoreline's net worth ratio fell to 1.8%. It was critically undercapitalized, and thus it was not clearly erroneous for the district court to apply a substantial jeopardy enhancement. Transcript of Sentencing at 383 (because Shoreline's net worth was less than 2%, the Federal Credit Union Act classified it as critically undercapitalized, the lowest level of capital adequacy short of insolvency); *see also Young*, 413, F.3d at 733.

Furthermore, Shoreline was a small credit union and the amount of money Simmerman embezzled represented 86% of the earnings that Shoreline had accumulated over its entire sixty-two year history. Transcript of Sentencing at 386. The district court noted that Shoreline was lucky that there were not any large demands on Shoreline before it recovered on its fidelity bond, since Shoreline likely would not be able to meet the demand given Simmerman's embezzlement. This was not a clearly erroneous conclusion given the amount of money that Simmerman embezzled compared to the size of the credit union. *Id*. at 410.

Additionally, although there was not an actual government "bailout" of Shoreline, it does not negate the fact that Shoreline was able to avoid some of the substantial jeopardy factors because of actions by the NCUA Board. Although Simmerman argues that the NCUA Board did not really take any action and that it just "let the credit union continue to operate," the NCUA Board's decision to allow Shoreline to operate was in fact a government action. Section 1790d(i)(1) of Title 12 required the NCUA Board to act within ninety days since Shoreline was critically undercapitalized. The NCUA Board was required to either "(A) appoint a conservator or liquidating agent for the credit union; or (B) take such other action as the Board determines would better achieve the purpose of this section, after documenting why the action would better achieve that purpose." *Id*. The NCUA Board decided to give Shoreline six months to continue operating to allow Shoreline time to recover on its insurance bond. Alternately, Shoreline could have been shut down within ninety days.

By the commentary's own terms, the list of factors it contains is "non-exhaustive" and establishes only the requirement that the district court "shall consider" the factors listed in the Application Note in determining whether conduct arises to the level of substantially jeopardizing the safety and soundness of a financial institution. *See* § 2B1.1 cmt. n.13. The district court did just that. The district court considered several factors and found that, because of Simmerman's embezzlement, a small credit union became critically undercapitalized and it was in serious jeopardy of insolvency, absent recovery on its insurance bond. Therefore, the district court was not clearly erroneous when it assessed a sentencing enhancement for jeopardizing the soundness of a financial institution.

iii.     Abuse of a position of trust

Under U.S.S.G. § 3B1.3, a defendant's offense level should be increased by two levels if she "abused a position of public or private trust." Per Application Note 1, a "position of public or private trust [is] characterized by professional or managerial discretion." U.S.S.G. § 3B1.3 cmt. n.1. Persons holding such positions "are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature." *Id*. For the enhancement to apply, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id*. The application note specifies that the adjustment would apply to "a bank executive's fraudulent loan scheme" but not "embezzlement or theft by an ordinary bank teller." *Id*.

The district court found that Simmerman, as a manager of Shoreline, was given a certain level of trust that she clearly violated. In ruling that she abused a position of trust, the district court held that "[a] manager of a credit union is given certain discretion," and "certain requirements," including "honestly and completely direct[ing] the people under them and direct[ing] where the monies are to be taken from and where they are to be put to." Transcript of Sentencing at 417. The district court went on to find that "her actions and the trust that was given to her as the manager of this credit union by the Board was clearly violated." *Id*.

This finding was not clearly erroneous. Simmerman, as the manager of Shoreline, was given a level of managerial discretion and was rarely supervised. In fact, Simmerman was subject to no day-to-day supervision and the only oversight was provided by a group of part-time, volunteer Board and Supervisory Committee members who met at most once a month to discuss Shoreline's financial position. *Id*. at 381-82. Other than that, Simmerman was the sole person overseeing Shoreline's day-to-day activities. Further, her duties included accessing the cash vault by herself; the preparation of financial reports to the Board, the auditors, and the NCUA; and decisions about what investments to make. *Id*. at 382-83, 390-91.

There is also no question that Simmerman's position of trust significantly contributed to "the commission or concealment of the offense." U.S.S.G. § 3B1.3, cmt. n.1. As the NCUA

investigator testified at sentencing, Simmerman's position enabled her "to access the cash and change the financial records of the credit union to reflect that the cash was still there when in fact it wasn't because she didn't have any day-to-day supervision." Transcript of Sentencing at 383. Simmerman hid her crime from auditors by preparing fictitious general ledger entries prior to the audits and decreasing the amount reflected in the vault general ledger balance to match the amount of cash actually in the vault. Again, there was no day-to-day oversight and what little oversight that there was, by nature of the part-time volunteer Board and the quarterly audits, relied on the fabricated reports that Simmerman provided. Simmerman was a trusted manager who abused her position of trust to conceal her criminal actions. Thus, the district court was not clearly erroneous when it assessed a sentencing enhancement for abuse of a position of trust.

## CONCLUSION

The district court was not clearly erroneous when it assessed sentencing enhancements on Simmerman for (1) sophisticated means (U.S.S.G. § 2B1.1(10)(C)); (2) jeopardizing the soundness of a financial institution (U.S.S.G. § 2B1.1(b)(16)(B)(i)); and (3) abuse of a position of trust (U.S.S.G. § 3B1.3). Because the district court did not clearly err when it assessed the sentencing enhancements, we **AFFIRM** the district court's decision.