RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-5181

MARK C. SAWYER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:11-cr-00082—J. Ronnie Greer, District Judge.

Argued: March 8, 2016

Decided and Filed: June 3, 2016

Before: BOGGS, GIBBONS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Francis L. Lloyd, Jr., LAW OFFICE OF FRANCIS L. LLOYD, JR., Knoxville, Tennessee, for Appellant. Matthew T. Morris, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Francis L. Lloyd, Jr., LAW OFFICE OF FRANCIS L. LLOYD, JR., Knoxville, Tennessee, Ashley Meredith Lowe, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Knoxville, Tennessee, for Appellant. Matthew T. Morris, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  In 2006, Mark Sawyer and four co-defendants formed A&E Salvage and purchased the salvage rights to a former industrial site in eastern Tennessee in order to demolish the buildings on site and obtain salvageable material.  Despite the presence of large amounts of regulated asbestos-containing material (RACM), A&E Salvage knowingly failed to comply with the National Emission Standards for Hazardous Air Pollutants (NESHAP) for asbestos.  The Environmental Protection Agency (EPA) eventually intervened and cleaned up the site, pursuant to its power under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) at a total cost of over $16 million. Sawyer eventually pled guilty to one count of conspiring to violate the Clean Air Act, 18 U.S.C. § 371.  The district court sentenced Sawyer to a 60-month prison term and held Sawyer and his co-defendants jointly and severally liable for $10,388,576.71 in restitution to the EPA.  Sawyer challenges his sentence and the district court's restitution award. For the reasons that follow, we affirm.

I.

Sawyer, along with four co-defendants, formed A&E Salvage for the purpose of recovering salvageable materials, such as copper, steel, and aluminum, from the site of the former Liberty Fibers rayon plant in Hamblen County, Tennessee.  The site occupied approximately 300 acres and contained multiple buildings, a water treatment facility, as well as extensive above ground piping. Demolition at the site began in October 2006.  The defendants' business records show that A&E Salvage intended to salvage materials within seven buildings on site and then demolish them.  At the time A&E Salvage purchased the salvage rights, many of the buildings on site contained RACM, such as pipe-wrap, boiler insulation, roofing materials, and floor tiles. Sawyer and his co-defendants were aware that the site contained RACM, and much of the RACM on site was marked with red dots.

Despite the presence of RACM, the defendants' salvage and demolition activities failed to comply with the NESHAP standards governing the handling and disposal of asbestos. Among other violations, laborers at the site were not provided with the proper safety equipment such as respirators or protective suits. Some workers were asked to "remove friable asbestos without adequately wetting it," as required by the NESHAP, while others were made to seal and pack inadequately wetted asbestos for disposal. CA6 R.9, PSR at 6.

On August 8, 2008, the EPA and A&E Salvage entered into a consent agreement whereby A&E Salvage agreed to correct the asbestos violations and comply with the NESHAP during its future removal and demolition activities. On March 10, 2009, the EPA terminated the consent agreement and issued an immediate compliance order to A&E Salvage, Sawyer, and the other defendants. The order stated that all individuals were to cease any activity on the site. Three weeks later, on March 31, 2009, federal agents searched the site, seized documents, and took samples of RACM. The investigators estimated that nearly all 300 acres of commercial property were contaminated with asbestos. Thereafter, the EPA, exercising its power under CERCLA, cleaned up the site, at a total cost of $16,265,418.

In 2011, a grand jury indicted Sawyer and his co-defendants for conspiring to violate the Clean Air Act and defraud the government, in violation of 18 U.S.C. § 371. The indictment also charged four substantive counts of Clean Air Act violations. Three years after the indictment,[1] Sawyer pled guilty to one count of conspiring to violate the Clean Air Act, 18 U.S.C. § 371. As part of his plea agreement, Sawyer explicitly waived his right to appeal a sentence within the guidelines range. He only retained the right to appeal any sentence of imprisonment above the guidelines range.

On October 14, 2014, the probation office filed its presentence investigation report (PSR), which calculated a guideline sentencing range of 87 to 108 months. The statutory maximum for offenses under 18 U.S.C. § 371 is 60 months, and because the low end of Sawyer's range was above the statutory maximum, his effective range was 60 months. The district court ultimately sentenced Sawyer to a 60-month term of imprisonment.

---

[1] All of Sawyer's co-defendants pled guilty more than a year before Sawyer.

On the issue of restitution, the PSR stated that "the final cost for the clean-up at the Site was $16,265,418" but that "an exact amount in relation to requested restitution is not known." CA6 R.9, PSR at 18.  The PSR also specified "[it] is believed that [information supporting the government's restitution claim] will be provided to the Court prior to the sentencing of the defendants." *Id.*

On October 31, 2014, three weeks before the sentencing hearing, the United States submitted notice that it sought restitution in the amount of $10,688,576.71, a subset of the total cleanup costs.  The final amount requested did not include indirect costs such as attorney's fees and other administrative costs and associated travel costs.  Attached to its claim, the United States included a spreadsheet known as a SCORPIOS report, which itemized the costs the EPA incurred to pay contractors who undertook the bulk of the cleanup.  The report also included direct costs associated with EPA personnel managing the cleanup, which were itemized by individual employees.  The government further argued that restitution was mandatory in this case, pursuant to 18 U.S.C. § 3663A.  On November 10, 2014, Sawyer filed a reply in support of his motion to dismiss the restitution claim, which set forth his objections to the adequacy of the SCORPIOS report to support a restitution award.

On November 19 and 20, 2014, the district court held a sentencing hearing.  The court heard the testimony of Karen Buerki, an on-scene coordinator for the EPA, who described the EPA's cleanup efforts and corroborated the costs in the SCORPIOS report.  In particular, she testified that the government was only seeking its direct costs for cleaning up the site, and not indirect costs like attorney's fees.  On the subject of other hazardous materials found on site, Buerki estimated that the EPA incurred approximately $300,000 cleaning up and removing materials that did not contain asbestos.  The government also presented testimony from multiple laborers involved in A&E Salvage's operations who testified to Sawyer's role in the conspiracy and to the unsafe conditions on site.

After two more days of argument in January 2015, the court entered an order finding that restitution was mandatory in this case, pursuant to § 3663A, and finding that the government had established that it was entitled to $10,388,576.71.  The court found the SCORPIOS report to be a reliable indicator of the EPA's direct costs, and it credited Buerki's testimony.  In arriving at the

final restitution amount, the court subtracted $300,000 from the government's requested amount based on Buerki's testimony that the EPA expended that amount removing hazardous substances other than asbestos.

Following this order, the district court entered judgment against Sawyer, sentencing him to 60 months in prison and ordered him and his co-defendants, jointly and severally, to pay $10,388,576.71 in restitution to the EPA.

II.

This court reviews *de novo* whether a defendant is appealing an issue within the scope of an appellate waiver. *United States v. Toth*, 668 F.3d 374, 378 (6th Cir. 2012).

Sawyer claims that his 60-month sentence is substantively unreasonable, arguing that it was unreasonable for the district court to sentence him, an individual with no criminal history who pled guilty, to the statutory maximum prison term, particularly in light of the fact that his co-defendants were sentenced to lesser terms. Sawyer concedes, however, as he must, that he "waived his right to appeal from a sentence not above the sentencing guideline range . . . [and that] his term of imprisonment of 60 months was . . . within the advisory Guidelines range." CA6 R. 16, Appellant Br. at 27. "It is well settled that a defendant may waive any right, even a constitutional right, by means of a plea agreement." *Toth*, 668 F.3d at 377 (quoting *United States v. Calderon*, 388 F.3d 197, 199 (6th Cir. 2004)). This court construes waivers such as Sawyer's to be binding, and by appealing an issue "that [he] stipulated to and agreed not to contest [Sawyer] is attempting to void the plea agreement." *United States v. Bazzi*, 94 F.3d 1025, 1028 (6th Cir. 1996). When a criminal defendant attempts to appeal an issue within the scope of an appellate waiver provision, "[o]nly challenges to the validity of the waiver itself will be entertained on appeal." *Toth*, 668 F.3d at 377. Given Sawyer's concessions and the fact that he does not dispute that he entered his plea agreement knowingly and voluntarily, we decline to review the reasonableness of his sentence.

III.

Restitution orders are subject to a bifurcated standard of review. "Whether a restitution order is permitted under the law is subject to de novo review," *United States v. Elson*, 577 F.3d 713, 720 (6th Cir. 2009) (citing *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006)), whereas "the amount of restitution ordered is reviewed under the abuse of discretion standard," *Johnson*, 440 F.3d at 849 (quoting *United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004)).

A.

Sawyer first takes issue with the district court's determination that restitution was mandatory in this case pursuant to the Mandatory Victim's Restitution Act (MVRA), 18 U.S.C. § 3663A. The MVRA, which amended the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. § 3663, "requires a defendant to pay restitution to identifiable victims who have suffered either physical injuries or pecuniary losses as a result of certain criminal offenses." *United States v. Vandeberg*, 201 F.3d 805, 812 (6th Cir. 2000). "Specifically, restitution is mandatory—regardless of a defendant's financial situation—when a defendant is convicted of a crime of violence, an offense against property, or an offense related to tampering with consumer products." *Id.*; *see* 18 U.S.C. § 3663A(c). In this case, the district court determined that Sawyer's conviction for conspiracy to violate the Clean Air Act was an "offense against property."

Sawyer contends that the EPA cannot be a victim an offense against property because the agency does not have a possessory interest in the asbestos-contaminated land. The question raised by Sawyer's appeal appears to be one of first impression in this circuit: Whether a federal governmental agency forced to expend funds to remedy the harm caused by a criminal offense can be properly deemed a victim of an "offense against property" under § 3663A(c) when the government has no possessory interest in the land?

As an initial matter, while "[t]he MVRA does not define 'offense against property'" *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014), it is clear that offenses that result in the contamination of property with a dangerous or an apparently dangerous substance typically qualify for restitution under § 3663A. For example, in *United States v. Quillen*, the defendant

mailed envelopes that appeared to contain anthrax to the Pennsylvania Board of Probation and Parole. 335 F.3d 219, 220 (3d Cir. 2003). The parole board enlisted a county hazmat team to decontaminate its mailroom at a cost of more than $4,000. *Id.* The district court awarded mandatory restitution to the Parole Board under the MVRA, and the Third Circuit affirmed. *Id.* at 220–21. In finding that restitution was mandatory under the MVRA, the court "agree[d] with those courts that hold clean-up or repair costs may be ordered under the MVRA." *Id.* at 226. In a similar case, the Ninth Circuit determined that the MVRA provided statutory authority to order restitution to a motel owner for clean-up costs he incurred remediating a motel room in which the defendant had cooked methamphetamine. *United States v. Brock-Davis*, 504 F.3d 991, 994, 996–98 (9th Cir. 2007). Based on the reasoning in these cases, Sawyer's offense of conviction, which resulted in the asbestos contamination of nearly 300 acres of land, certainly qualifies as an "offense against property" within the meaning of § 3663A.

What is equally clear from the case law is that a government agency can be a victim to whom restitution is owed, regardless of whether it has a possessory interest in the affected property. In *United States v. Phillips*, the defendant was convicted of violating and conspiring to violate the Clean Water Act. 367 F.3d 846, 849 (9th Cir. 2004). The offense of conviction resulted in the discharge of pollutants—sediment and mine tailings—into navigable waters of the United States running through private property. *Id.* at 850–51. The EPA expended significant funds cleaning up the discharge, pursuant to its authority under CERCLA. *Id.* at 852–53. The court determined that the "district court must include any reliable CERCLA-related expenses" in calculating whether the offense of conviction required substantial expenditures, and it also found that the EPA's "site investigation costs may be recoverable through restitution orders. . . . if [the costs] are not routinely incurred prosecuting criminal cases but instead are a 'direct and foreseeable result' of the Government's mitigation of the damage [the defendant] caused." *Id.* at 857, 862–64. Similarly, in *United States v. Overholt*, the defendant was convicted under 18 U.S.C. § 371, for conspiracy to violate various environmental statutes, including the Safe Drinking Water Act and the Resource Conservation and Recovery Act. 307 F.3d 1231, 1235–36 (10th Cir. 2002). The conspiracy resulted in, among other things, the unauthorized disposal of petroleum-impacted wastewater into disposal wells and into above-ground oil-storage tanks on private property. *Id.* at 1235, 1237. The defendant was ultimately ordered to pay restitution to

the Coast Guard in the amount of $1,265,078, the costs "of removing the storage tanks from the . . . property and cleaning up the area." *Id.* at 1253. The Tenth Circuit affirmed, reasoning that although the Coast Guard's losses were solely economic, "[p]urely financial losses have been recognized as proper subjects of restitution under both 18 U.S.C. § 3663 and § 3663A." *Id.* at 1254.

Sawyer has a rebuttal to this line of cases. He correctly points out that in cases ordering restitution to government agencies enlisted to clean up property the agencies do not own, courts have not definitively answered whether restitution was authorized under § 3663 or § 3663A. *See Phillips*, 367 F.3d 846; *Overholt*, 307 F.3d 1231. Sawyer further notes that in cases where restitution has been ordered pursuant to § 3663A for an offense against property, the party recovering remediation costs has had an identifiable property interest in the affected property. *See Brock-Davis*, 504 F.3d at 996–98 (motel owner was awarded restitution for costs incurred to clean one of his motel rooms); *United States v. Barton*, 366 F.3d 1160, 1164–67 (10th Cir. 2004) (restitution was ordered to the government pursuant to MVRA after defendant set fire to federal forest); *Quillen*, 335 F.3d at 225–26 (Pennsylvania Parole Board was awarded restitution for costs to decontaminate its own mail room). In addition to the relevant case law, Sawyer relies heavily on the text of § 3663A(b)(1), which specifies the proper methods for restoring property or its value following a crime that "result[s] in damage to or loss or destruction of *property of a victim* of the offense." CA6 R. 16, Appellant Br. at 12–14. Sawyer reads the relevant case law and this section of the statute to define what constitutes a qualifying "offense against property," contending that § 3663A(b)(1) implies a requirement that the victim have a possessory interest in the affected property.

Sawyer's position suffers from several problems. First, § 3663A(b) prescribes the ways in which a court should craft an order of restitution; it does not purport to define an "offense against property." *See Luis*, 765 F.3d at 1065–66. Second, as other courts have made clear, § 3663A(c)(1)(B) aims to compensate victims of certain crimes, not only for physical injuries but also for solely economic harm. *Overholt*, 307 F.3d at 1254. Finally, and most importantly, the exact language on which Sawyer relies in the MVRA as requiring a victim to have a possessory

interest in the affected property also appears in the VWPA.**2** Were a possessory interest required or implied by the statutory language Sawyer relies on, the courts in *Overholt* and in *Phillips* would not have ordered restitution to the Coast Guard and the EPA respectively for their cleanup efforts. In *Overholt*, the court ordered restitution for cleanup costs even though "the Coast Guard's loss was not as an owner of the Peko property. Its loss was a purely financial one; the property it lost was money." 307 F.3d at 1254. Likewise, in *Phillips*, the court found that the EPA's investigation costs, a subset of its cleanup and remediation costs, were recoverable under the restitution statutes, even though the polluted waters were on private property. 367 F.3d at 862–63; *see also United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 315 (3d Cir. 1997) (affirming district court's award of restitution to the Coast Guard based on the costs required to clean the environmental damage caused by defendants' conduct).

The Tenth Circuit in *Overholt* pondered the same reading of the restitution statutes that Sawyer urges here and it rejected such an interpretation:

> Perhaps . . . [the] restitution statutes could be read to say that when there is physical damage to property, the only permissible restitution is payment to the property owner of the amount calculated in accordance with that language, regardless of any financial loss to another victim who was not an owner of the property. But that perverse reading of the statute is certainly not "clear or obvious under current law." If it were, we question whether the Third Circuit would have upheld an order of restitution under the VWPA requiring the defendants to pay the Coast Guard's cost of cleaning up their pollution of navigable waters.

307 F.3d at 1254 (citing *W. Indies Transp.*, 127 F.3d at 315). *Overholt*'s reasoning is compelling, and we rely on it to reject Sawyer's argument that a party without a possessory interest in the damaged property cannot be a victim under the MVRA.

The district court properly concluded that restitution was mandatory under § 3663A because Sawyer's offense of conviction is a qualifying "offense against property" and the EPA is an identifiable victim of that offense.

---

**2** "[I]n the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense. . . ." 18 U.S.C. § 3663A(b)(1); *see also* § 3663(b)(1) (same).

B.

Sawyer next claims that the government failed to establish by a preponderance of the evidence that all of the EPA's losses were directly and proximately caused by his offense of conviction.

As an initial matter, because the district court correctly determined that restitution was appropriate in this case, we review the court's determination regarding the amount of the government's losses for an abuse of discretion. *Elson*, 577 F.3d at 725; *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009).

Whether restitution is mandatory or permissive, the government must establish that actual losses to a victim were directly and proximately caused by the offense of conviction. 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2). When there is a dispute as to the amount of restitution, this proof must be "resolved by the court by the preponderance of the evidence." *Id.* § 3664(e); *see also United States v. Batti*, 631 F.3d 371, 378 (6th Cir. 2011). Although a district court need not make specific factual findings in calculating restitution, the information underlying an award must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Jackson-Randolph*, 282 F.3d 369, 386 (6th Cir. 2002) (quoting *United States v. Herrera*, 928 F.2d 769, 773 (6th Cir. 1991)). In this case, the SCORPIOS report showed that the EPA incurred a total of $16,567,541.65 in CERCLA costs. The government sought restitution for a portion of those costs, $10,688,576.71, the total CERCLA costs minus indirect costs—attorney's fees, overhead, or other administrative costs. The district court ultimately ordered $10,388,576.71 in restitution, subtracting $300,000 from the government's requested amount based on testimony that the EPA removed other materials besides asbestos at a cost of $300,000. In fashioning its award, the district court credited Karen Buerki's testimony as reliable and it adopted the SCORPIOS report, save the $300,000.

Sawyer raises several objections to the amount of restitution imposed. Initially, he relies on *Paroline v. United States*, 134 S. Ct. 1710 (2014), a case involving restitution to victims of child pornography. There, he points out, the Court stated that it is a "bedrock principle that restitution should reflect the consequences of the defendant's own conduct." *Id.* at 1725. The

court went on to hold that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id.* at 1727. Sawyer urges the panel to import this reasoning to the restitution award in his case. He suggests that the district court erred in assessing the *total* losses attributed to the conspiracy jointly and severally against him and his co-defendants rather than assessing an amount keyed to his specific role in the conspiracy.

Sawyer's reliance on *Paroline* is misplaced. There, the Court distinguished the hundreds or even thousands of perpetrators of child pornography who "ha[ve] no contact with the overwhelming majority of the [other] offenders" from "a set of wrongdoers acting in concert" such as a "'gang of ruffians' [that] collectively beats a person." *Id.* at 1724–25. The Court went on to express uncertainty about "whether it could ever be sensible to embrace the fiction that this victim's entire losses were the 'proximate result' of a single possessor's offense." *Id.* at 1725 (internal citation omitted). Unlike the isolated and more passive crimes of the defendant countenanced in *Paroline*, Sawyer's conviction for conspiracy necessarily implies his concerted action with others. And this is not a case where Sawyer agreed to play a minor role in a larger scheme. Rather, he fully participated in the fundamental aspects of A&E Salvage's unlawful conspiracy to violate the Clean Air Act. *Paroline*'s concerns about the legal and administrative sensibility of adopting joint and several liability in child-pornography crimes simply do not translate to a case involving a finite conspiracy with five defendants who were acting in concert.

"[U]nder the MVRA, if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction." *Elson*, 577 F.3d at 723 (citation and internal quotation marks omitted). Section 3664(h) specifically empowers district courts to make individual defendants liable for all of the losses caused by multi-defendant crimes, and we have consistently affirmed such decisions in the conspiracy context. *See United States v. Rozin*, 664 F.3d 1052, 1066 (6th Cir. 2012) ("[U]pon finding Rozin guilty of conspiracy . . . the district court could hold Rozin jointly and severally liable for the entire restitution amount . . . ."); *United States v. Williams*, 612 F.3d 500, 513 (6th Cir. 2010) ("[B]y participating in a conspiracy to commit healthcare fraud, Williams bore the risk of

becoming financially responsible for the entire amount of the conspiracy victims' losses."); *see also Bogart*, 576 F.3d at 576. Accordingly, it was not error for the court to hold Sawyer jointly and severally liable for the entire $10,688,576.71.

Sawyer next contends that the SCORPIOS report submitted by the government was insufficient to establish the government's losses in this case. He cites a plethora of cases, although none from this circuit, which suggest that summary accounting tables, like the SCORPIOS report, are insufficient standing alone to support a restitution award. *See United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) ("[T]he district court erred by relying exclusively on the one-page loss summaries provided by the victims and in not requiring more detailed explanations of the losses each victim suffered."); *United States v. Hartstein*, 500 F.3d 790, 796 (8th Cir. 2007) ("Summary tables of accounting data that are based on evidence not before the court, and that a party has challenged as inaccurate, are not sufficient to support a court's factual findings."); *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998) ("[T]he government must provide the district court with more than just the general invoices . . . ostensibly identifying the amount of their losses. The government must provide sufficient explanations (supported by evidence reflected in the record) as to how these invoiced losses directly relate to Menza's criminal conduct involved in his underlying convictions.").

In light of these cases, perhaps it would have been an abuse of discretion for the district court to rely solely on the SCORPIOS report, but the report was not the only information underlying the restitution claim. Buerki, an on-site supervisor for the EPA, testified at great length on the first day of the sentencing hearing about the SCORPIOS report. The district court credited her testimony and found that it substantiated the costs detailed in the report. Sawyer attacks her testimony on the basis that she had no personal knowledge of the site prior to her arrival in 2011. He maintains that nothing in the record establishes that all of the asbestos remediation costs were attributable to A&E Salvage's conspiracy, and suggests, without offering any proof, that some of the EPA's costs could have been the result of conditions preexisting A&E Salvage's activities. While Buerki herself lacked personal knowledge of the site prior to 2011, ample evidence in the record rebuts Sawyer's position, including the following: a timeline and chart of a Tennessee Department of Environment and Conservation asbestos inspector

detailing A&E Salvage's demolition of buildings on the site during 2007, aerial photos of the site pre- and post-demolition, individual reports from workers who worked at the site before and during A&E Salvage's activities, A&E Salvage's own records of the demolition, and forty-seven pages of interview notes from people involved in or who witnessed the demolition and salvage operations performed by A&E Salvage.

Given the ample reliable evidence in the record establishing that A&E Salvage's activities on the site directly caused the asbestos contamination, which the EPA then cleaned up, it was not an abuse of discretion for the district court to award the government all of its claimed costs minus the $300,000 in costs that Buerki testified were spent cleaning up other hazardous materials on the site.[3]

## C.

Sawyer also finds error in the district court's failure to submit the restitution claim to a jury. In *Apprendi v. New Jersey*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Five years later, this court grappled with *Apprendi* in the context of restitution awards and found that "[a]lthough restitution is considered punishment . . . we have nevertheless held that restitution orders are not affected by the Supreme

---

[3] In similar cases, other courts of appeals have found that cleanup costs are directly attributable to and proximately caused by offenses that contaminated property. In *Quillen*, the Tenth Circuit found that "[b]ut for [defendant's mailing of powder-filled envelopes], the Parole Board would not have incurred an actual loss of $4,026.55, the cost of decontaminating a room believed to be tainted by a deadly substance." 335 F.3d at 225–26. The court next found that the "itemized invoices" submitted by the company that performed the decontamination established that the Parole Board's expense "was an actual loss directly resulting from [the defendant's] conduct." *Id.* at 226. In *Brock-Davis*, the victim of a conspiracy to manufacture methamphetamine requested the costs to remediate the victim's motel room, including replacement costs for ruined furniture. 504 F.3d at 995. In addition to a victim statement, the victim also testified at the restitution hearing that the "victim statement accurately reflected what items were required to be disposed of" and the court noted that "[t]here was no impeachment of [the victim's] credibility or any evidence that specific furnishing were not necessary replacements." *Id.* at 1002. The court distinguished the case from *Menza*, noting that the victim statement along with the victim's testimony met the government's burden of proof. *Id.* Finally, in *Barton*, the government sought $14.7 million in restitution after defendant burned a forest on federal lands. 366 F.3d at 1162, 1166–67. The government asserted that the amount it requested "was derived from the monies spent by the Forest Service following extinguishment of the fire in revegetating the forest to prevent erosion in the aftermath of the fire." *Id.* at 1167. It further claimed that such revegetation costs were an "easily ascertained proxy for the 'loss' sustained by the Forest Service as a result of [the defendant's] crimes." *Id.* The court ultimately approved this proxy approach, noting that "revegetation can be viewed as an effort to repair the forest and would not have occurred absent the fire." *Id.* (internal quotation marks omitted).

Court's ruling in [*Apprendi*] because the restitution statutes do not specify a statutory maximum." *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005).  Sawyer contends that the Supreme Court's recent expansion of *Apprendi*'s reasoning to criminal fines in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), effectively overrules *Sosebee*.

Sawyer's reliance on *Southern Union*, however, is unavailing.  As Sawyer readily admits, *Southern Union* "did not address the issue of fact-finding concerning restitution obligations." CA6 R.16, Appellant Br. at 26.  What is more, *Southern Union* did nothing to call into question the key reasoning at the heart of *Sosebee*, namely that the restitution statutes do not specify maximum awards.  *See United States v. Churn*, 800 F.3d 768, 781–82 (6th Cir. 2015).  In *Churn*, this court determined that *Sosebee* remains controlling authority, that "*Apprendi* does not apply to the MVRA," and that *Southern Union* did not cast doubt its conclusions because the statute at issue in that case "had a defined statutory daily maximum."  *Id*. at 782.  In light of *Sosebee* and *Churn*, the district court was not required to submit the restitution claim to a jury.

D.

1.

Sawyer attacks the restitution award on various other grounds.  First, he contends that the district court should have dismissed the restitution claim because 18 U.S.C. § 3664(a) imposes "specific procedural requirements to be met before a restitution obligation will be imposed." CA6 R.16, Appellant Br. at 9.  Although his arguments are underdeveloped, Sawyer essentially asserts that § 3664(a) and Federal Rule of Criminal Procedure 32 combine to require the probation office to include details sufficient to support a restitution award in the PSR, something the probation office failed to do here.  Section 3664(a) states that "[f]or orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, *or in a separate report*, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order" (emphasis added).  Section 3664(c) makes Federal Rule of Criminal Procedure 32 applicable to restitution orders.  That rule in turn provides that "[i]f the law permits restitution, the probation officer must conduct an investigation

and submit a report that contains sufficient information for the court to order restitution." Fed. R. Crim. P. 32(c)(1)(B).

Where Sawyer's argument for a strict procedural requirement emanates from, however, is unclear, given § 3664(a)'s text, which allows courts to order "a separate report" containing information sufficient to support a restitution order. Moreover, in a similar case involving conspiracy to violate the Clean Water Act, the Ninth Circuit ordered restitution for cleanup costs despite the fact that the presentence report "recommended restitution in an unspecified amount," and instead "recommended that the district court make a factual finding on the appropriate amount of restitution." *Phillips*, 367 F.3d at 853. Sawyer cites no case from this or any other court holding that restitution can be ordered only when the PSR contains information sufficient to support a restitution order. We decline to create such a rule in this case.

2.

Sawyer also raises due-process concerns about the government's disclosures in this case. He contends that the government's disclosure of the SCORPIOS report some three weeks before sentencing was too late to provide him adequate notice and opportunity to respond.

Like the previous claim, this claim is meritless. Sawyer was on notice that restitution would be a contested issue "from practically the outset of this case." R. 307, Sentencing Tr., Page ID 2008–09. As the trial judge noted at the sentencing hearing, "it has been known for many, many, many months that this court was ultimately going to have to make some factual determinations about restitution in this case." *Id.* at 2009. Further, on October 8, 2014, more than forty days prior to the sentencing hearing, the trial court held a status conference concerning, among other things, Sawyer's motion regarding restitution.

In regards to the information underlying the restitution claim, Sawyer had ample opportunity to review and respond to the documents and witness testimony provided by the government. He received the detailed SCORPIOS report on October 31, 2014, approximately three weeks before the November 19th and 20th restitution hearing. Sawyer filed a reply in support of his motion to dismiss the claim for restitution on November, 10, 2014, which addressed at some length the invoice submitted by the government. At the hearing, Sawyer, as

well as his co-defendants, also had the opportunity to present their own witnesses and to cross-examine the witnesses the government called in support of its restitution claim. Perhaps most importantly, as the trial court pointed out at the hearing, "after being provided the documents, [Sawyer] never made a specific request of the government to provide additional detail or to provide other documents or to interview witnesses; never sought intervention by the court to require the government to produce additional detail." *Id.* at 2009.

Following the November 19th and 20th, 2014, restitution hearing, Sawyer was entitled to and did file objections to the PSR in the form of a supplemental sentencing memorandum. He was even granted an extension of time until December 11, 2014, to file his objections. Sawyer's written objections to the PSR ultimately included five pages objecting to restitution in this case, including objections to the government's SCORPIOS report and the government's witness testimony at the hearing.

In sum, Sawyer was on ample notice of the government's claim for restitution and of the documents, information, and testimony underlying that claim, and he was given every opportunity and adequate time to respond to the government's evidence both during and following the sentencing hearing.

3.

Finally, Sawyer points out that the United States has an alternative means of seeking compensation for the costs it incurred cleaning up the former industrial site: a civil cost-recovery action under CERCLA, see 42 U.S.C. § 9607. Based on nothing more than the existence of this alternative, Sawyer contends that the district court abused its discretion in ordering restitution in his criminal case. The trial judge noted at the sentencing hearing that he knew "of absolutely no authority for the court to require a victim in a criminal case otherwise entitled to restitution to seek damages through a civil case rather than through restitution. . . . [T]hat argument is supported by simply no authority that this court is aware of." *Id.* at 2006–07. On appeal, Sawyer has not corrected this problem. He provides no case law to support his contention that a district court abuses its discretion when it orders restitution to the government in a criminal case when

the government has a civil recovery mechanism at its disposal, and we decline to create such a rule.

## IV.

For the foregoing reasons, we affirm Sawyer's 60-month sentence and the district court's restitution award.