NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0477n.06

Case No. 17-2208

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>KWAME M. KILPATRICK,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

FILED
Sep 21, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

SUTTON, Circuit Judge. A jury convicted Kwame Kilpatrick, once the mayor of Detroit, of extortion, bribery, fraud, and RICO conspiracy, among other crimes. The district court sentenced him to 28 years in prison and ordered him to pay the Detroit Water and Sewerage Department $4.5 million in restitution. We affirmed Kilpatrick's conviction and sentence but vacated the restitution award. On remand, the district court entered a revised award in the amount of $1.5 million. We affirm.

I.

According to the evidence presented at trial, Kilpatrick used his approval power over Detroit Water and Sewerage Department contracts to extort contractors into hiring his friend Bobby Ferguson as a contractor on several projects. Ferguson in turn shared the profits from his trumped-up fees with Kilpatrick.

In March 2006, one of these contractors, Lakeshore Engineering, submitted a bid on a contract to replace water mains in east Detroit. Leery of losing the bid because it had not hired Ferguson, as happened twice before, Lakeshore employed a Ferguson-connected business as a subcontractor for the project.

Victor Mercado, the Department's director and Kilpatrick's eventual co-defendant, told his contracts manager that, consistent with past practices, the second-place bid would win the contract, while the first-place finisher would obtain a companion contract to replace water mains on Detroit's west side. Once all the bids came in, the bid evaluators scored them. Lakeshore came in fifth place, while Superior Engineering ranked first. Mercado instructed his contracts manager to re-rank the contenders with a methodology the Department had never used before in this setting. The rescoring jumped Lakeshore to fourth place, with Superior still holding first.

A few days later, Mercado called the contracts manager to attend a suddenly arranged meeting with Kilpatrick. Kilpatrick wanted to discuss the weight the City gave to whether a company was based in or certified as local to Detroit. Kilpatrick mentioned one of Superior's subcontractors on the water-main bid as an example of an out-of-state company that had a local certification. The day after this discussion, Mercado told the contracts manager to have the relevant city office investigate that subcontractor's certification status. Soon after, the office decertified the subcontractor. A staff member pointed out that the City's law department had previously approved the company's certification and nothing had changed since. In response, the office's director said, "[T]he mayor wants it done." R. 361 at 124–25. The office backdated the decertification to precede Superior's bid, requiring the Department to reevaluate the bid in light of the decertification. The rescoring bumped Superior to third place.

2

Around this time, Mercado's contracts manager received a new Detroit-headquartered certification for one of Lakeshore's subcontractors. Mercado instructed him to rescore Lakeshore's bid, even though the certification was late and the Department had not extended such grace before. Lakeshore vaulted to second place. The first-place finisher got the west-side contract, and Lakeshore secured the east-side contract—even though it charged $1.5 million more than Superior.

After the jury convicted Kilpatrick for this and other like-minded crimes, the district court ordered him to pay the Department $4.5 million in restitution, the amount that he and Ferguson had gained from their misdeeds over the years. *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015). We vacated the award because the restitution statute speaks of a victim's loss, and a perpetrator's profit may stand in for that figure only if the government establishes correlation. *Id.* at 388–90. On remand, the district court awarded the Department $1.5 million in restitution. Kilpatrick appealed.

## II.

*The Department as victim*. Kilpatrick first contends that the district court lacked authority to order restitution for the loss caused by rigging the water-main bid. We review that question with fresh eyes. *United States v. Sawyer*, 825 F.3d 287, 291–92 (6th Cir. 2016).

The restitution statute requires defendants guilty of certain crimes to repay their victims' losses. 18 U.S.C. § 3663A. It defines victims as those "directly and proximately harmed as a result of the commission of [a qualifying offense]." *Id.* § 3663A(a)(2). In the context of a crime involving a scheme or conspiracy, a victim means "any person directly harmed by the defendant's criminal conduct in the course of the scheme." *Id.* The relevant conduct includes "any conduct that was part of the conspiracy." *Sawyer*, 825 F.3d at 295 (quotation omitted). When a defendant

is convicted by a jury, the indictment determines the scope of a conspiracy. *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011).

In describing this RICO conspiracy, the indictment mentioned Kilpatrick's manipulation of the water-main contract's bidding process as one of the ways in which he participated in a pattern of racketeering. The district court found that Superior would have won the contract if not for Kilpatrick's manipulation of the process, meaning the Department would have paid $1.5 million less for it. All of this shows that Kilpatrick's conduct in the conspiracy directly harmed the Department, entitling it to restitution in that amount.

Kilpatrick counters that the statute defines victims as those hurt by a crime of conviction, and bid-rigging was not an element of this RICO conspiracy. But that does not matter. What matters is that the indictment encompassed this bid-rigging, making it neither here nor there that it was not a separate count in the indictment or an element of the RICO conspiracy. *See Jones*, 641 F.3d at 714.

*United States v. Kones*, 77 F.3d 66 (3d Cir. 1996), does not alter this conclusion. A doctor pleaded guilty to submitting false insurance claims. *Id.* at 68. And the court denied restitution to a patient who had become addicted to painkillers, even after the patient argued that the doctor over-prescribed painkillers to control her in furtherance of his insurance-fraud scheme. *Id.* at 68, 71. As the Third Circuit saw it, the over-prescription that caused the addiction was not part of the criminal conduct that gave rise to Kones's fraud scheme. *Id.* at 71. Kilpatrick's case offers a model contrast. Bid-rigging directly caused this loss, and the indictment identified that conduct as part of Kilpatrick's scheme.

*Kilpatrick's actions as bid-rigging.* Kilpatrick separately argues that, when Lakeshore "leapfrogged" over Superior, that did not establish bid-rigging and at any rate the restitution

4

amount should not have been set as the difference between Superior's and Lakeshore's bids. R. 611 at 9.

The court, to start, did not clearly err in finding that bid-rigging occurred. The evidence showed a series of sketchy developments leading up to Lakeshore's win: the rescoring by an unprecedented method, moving Lakeshore to fourth place; the baseless revocation of Superior's subcontractor's certification; the backdating of the revocation; and the unprecedented rescoring of Lakeshore's bid in light of its subcontractor's late certification. But for these serial contrivances and contortions, the court reasonably found, the company that came in first under the usual bid-scoring method would have won the bid. No clear error occurred.

Nor did the court abuse its discretion in determining that the Department's loss equaled the difference between Superior's and Lakeshore's bids. Superior would have won the contract but for Kilpatrick's meddling. By coming in first place under the original and uncorrupted scoring system, Superior showed that it would have won without the later shenanigans. Only after several weeks of suspect activity did Lakeshore wade out on top. The difference for the Department was $1.5 million, and it is entitled to restitution for that amount.

We affirm.