NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0048n.06

Case No. 25-1591

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 26, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| ERICA CRABB, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

Before: GILMAN, GRIFFIN, and MURPHY, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Erica Crabb used her employer's credit cards to pay for personal expenses and take out cash advances, in sum totaling over $460,000. She paid off the charges and cash advances using company funds. Crabb covered up these transactions by carefully calibrating the amount and timing of these payments to legitimate payments used for business expenses, and by making false entries in the company's accounting system.

When Crabb's embezzlement was eventually discovered, she pleaded guilty without a plea agreement to three counts of wire fraud, in violation of 18 U.S.C. § 1343. The district court sentenced her to one year and a day of imprisonment, to be followed by three years of supervised release, and ordered her to pay $461,586 in restitution.

On appeal, Crabb challenges the restitution amount as well as the district court's application of sentencing enhancements for causing losses over $250,000 and for using

"sophisticated means" to conceal her crimes. For the reasons set forth below, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.

## I.    BACKGROUND

From August 2003 through October 2018, Crabb was employed as a controller at Grand Blanc Processing, LLC (Grand Blanc). She was responsible for managing at least ten company credit cards held by herself and other employees for authorized business transactions. Her duties included opening and issuing credit cards to Grand Blanc personnel for business expenses, reconciling the accounts each month, printing card statements and collecting receipts from each cardholder to compile them for Grand Blanc's president or vice president to review, preparing checks to the credit-card company to pay the balances, and making electronic-fund transfers between Grand Blanc's accounts.

Beginning in August 2009, Crabb eventually opened five credit-card accounts that she used to pay for her personal expenses, not business expenses, and to take out personal cash advances. She held one such card at a time. A management official apparently authorized Crabb to use the cards for personal expenses, but with the understanding that she was responsible for paying them off with her own funds.

Crabb incurred thousands of dollars in personal charges and took out thousands of dollars in cash advances on the cards, all of which totaled more than $460,000. She then paid off the credit-card bills with company funds. Ultimately, she reimbursed Grand Blanc for only a small amount of her personal expenses before she ceased working at the company in October 2018.

Crabb took steps to conceal these personal transactions. As part of reconciling the company's credit-card accounts each month, she would calculate the total amount that Grand

Blanc owed on the outstanding balances of all of the credit cards combined for authorized business expenses. The company paid off the total bill with a single payment.

Crabb was required to get approval from the president or vice president of Grand Blanc to make the payments to the credit-card company. After getting approval, she would send an electronic-fund transfer (EFT) or check from Grand Blanc's business-checking account to pay off the authorized business expenses, and a second EFT or check in the same amount to the credit-card account that she was using for her personal transactions. Crabb did not seek approval from management for the second payment.

To generate these payments, Crabb had to make entries in the Grand Blanc accounting system. She would first enter the authorized payment for her and the other employees' business expenses correctly. To cover up the second payment, Crabb used different tactics. Sometimes, she would manipulate the payroll. She would overstate in the accounting software the amount to be paid for payroll by the exact amount of the payment made on the credit card that she was using for her personal transactions. Crabb would then send the correct sum to the payroll-processing company for payment to employees. Other times, Crabb would falsely label the second payment in the accounting system as a payment into a retirement account managed by the company Voya. As a result of these tactics, the accounting system reflected that Grand Blanc had made only one payment on its credit cards, and that all outgoing funds were accounted for.

After Crabb left Grand Blanc in October 2018, this conduct was discovered. Crabb was indicted in September 2023 on three counts of wire fraud. She pleaded guilty without a plea agreement to all three counts in July 2024. After sentencing, Crabb timely appealed.

## II.    ANALYSIS

### A.  The district court abused its discretion when it ordered Crabb to pay $461,586 in restitution

We review the amount of restitution ordered by the district court under the abuse-of-discretion standard, *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016), and we review the scope of the restitution order de novo, *see United States v. Gray*, 121 F.4th 578, 586 (6th Cir. 2024).  Crabb challenges both the amount of restitution ordered and the scope of the restitution award.  We find merit in the first challenge but not the second.

In the Presentence Report (PSR), the government calculated a total loss of $461,586 caused by Crabb's conduct, apportioned between Grand Blanc and its insurer, Chubb Insurance.  Crabb objected in her Sentencing Memorandums to the restitution award recommended in the PSR.  Over Crabb's objection, the district court adopted the PSR's recommendation and ordered Crabb to pay the $461,586 in restitution pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A.

Courts can order restitution for only the actual losses that victims suffer.  *United States v. Fike*, 140 F.4th 351, 357 (6th Cir. 2025).  A court abuses its discretion when it orders restitution without properly determining the amount of the loss based on accurate information.  *United States v. Joseph*, 914 F.2d 780, 785 (6th Cir. 1990) (per curiam).

Here, the district court abused its discretion when it failed to subtract from the restitution award the small amount of money that Crabb paid back to Grand Blanc.  At the sentencing hearing, a forensic accountant with the Federal Bureau of Investigation (FBI) testified that Crabb's personal bank records indicated that Crabb had paid $5,591.87 to the credit-card company from her personal account. Assuming that this amount paid off some of her personal expenses, the government

asserted that the losses totaled $455,994.98, which is less than the amount of restitution that the district court ultimately awarded.

The FBI's forensic accountant also acknowledged that Crabb had written checks from her personal account to Grand Blanc in the amount of $13,220. She understood that some of the $13,220 went toward repaying a 401(k) loan that Crabb had taken out and part went toward reimbursing Grand Blanc for her husband's travel when he accompanied her on a work trip. The forensic accountant further found additional payments, totaling $16,729.11, paid to the order of Grand Blanc, "attention Erica Crabb," from Voya, the company that managed Grand Blanc's retirement-savings program. But she concluded that these latter payments referenced Crabb because of her role as controller, not because she had made payments to reimburse Grand Blanc from her retirement savings.

The district court did not make any findings about whether any of these payments might have offset the alleged losses caused by her wire fraud when it ordered Crabb to pay the $461,586 in restitution. That oversight may be understandable because the parties discussed these amounts primarily when debating whether Crabb caused more than $250,000 in losses for purposes of her Guidelines range. Still, we find that her general challenge to the restitution award sufficed to preserve the issue. Because any money that Crabb repaid is not a loss, we vacate the restitution award with instructions for the district court to subtract from the restitution award any payments that Crabb made to Grand Blanc for reimbursement or toward the balance of the company's credit cards used to pay for her personal expenses or to take out personal cash advances.

Crabb makes additional arguments challenging the restitution award that we find less persuasive. She contests the proof that the district court relied on in calculating the restitution amount, arguing that the court's order was based on "speculation" and on "broad generalizations

rather than transaction-level tracing to her conduct." Without presenting any evidence, Crabb alludes to "significant discrepancies" in "the government's accounting methods" and the court's purported failure to consider "the later time period where the Government had better records." We are not persuaded by these arguments.

"[T]he information underlying [a restitution] award must have 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016) (quoting *United States v. Jackson-Randolph*, 282 F.3d 369, 386 (6th Cir. 2002)). Here, the government presented a forensic-accounting report generated by Yeo & Yeo, P.C., an accounting, tax, and business-consulting firm. The report laid out each personal charge that Crabb made on the credit cards, including the date, amount, and vendor. It also documented the cash advances that Crabb took out, including the date and amount.

The government also presented testimony from a forensic accountant with the FBI regarding Crabb's claim that she had paid Grand Blanc back for some of the charges and cash advances that paid for her personal expenses. She noted the FBI's review of Crabb's bank-account statements, payroll statements, and checks that Crabb had written to Grand Blanc, as well as the FBI's examination of Grand Blanc's records. Many of the underlying documents were submitted to the district court for its review. Under these circumstances, the court did not abuse its discretion in relying on this evidence. *See Sawyer*, 825 F.3d at 296–97 (holding that the district court did not abuse its discretion in relying on an accounting report and testimony from the victim that substantiated the report to calculate the restitution award).

Crabb also challenges the scope of the restitution award, arguing that restitution should be restricted to the "three discrete unauthorized transactions" alleged in the counts to which she pleaded guilty—a total of $32,951.82 in losses. But under the Mandatory Victims Restitution Act,

18 U.S.C. § 3663A(a)(2), courts can order restitution for injuries caused by the "scheme, conspiracy, or pattern of criminal activity" for which the defendant was convicted. *See United States v. Elson*, 577 F.3d 713, 722–23 (6th Cir. 2009). Where, as here, the defendant is convicted pursuant to a guilty plea rather than by a jury, we look to the "plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for the purposes of restitution." *Id.* at 723 (citation modified).

Crabb pleaded guilty without a plea agreement. But at the plea colloquy, the government and Crabb's counsel agreed that she was pleading guilty to three counts of specific acts in furtherance of a "scheme to defraud." Because the plea colloquy demonstrates that the parties "contemplated a [scheme] that went beyond" solely the three unauthorized transactions supporting Crabb's conviction, the district court "had authority to order restitution for losses resulting from any conduct that was part of the [scheme]." *See Elson*, 577 F.3d at 724 (quoting *United States v. Cothran*, 302 F.3d 279, 290 (5th Cir. 2002)). Accordingly, we find no error in determining the scope of the restitution award.

**B. The district court did not err in finding that Crabb caused losses of over $250,000, triggering a sentencing enhancement under U.S.S.G. § 2B1.1(b)(1)**

Crabb next challenges the district court's application of a sentencing enhancement under United States Sentencing Guideline § 2B1.1(b)(1) for causing losses over $250,000. We review the method that the district court used to calculate losses de novo, and we review the court's factual findings as to the amount of the loss under the clear-error standard. *See United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013). Crabb raises challenges to both the method that the district court used to calculate the losses and its factual findings.

"When calculating the Guidelines range for a defendant convicted of fraud, the sentence is enhanced 'in proportion to the amount of actual or intended pecuniary loss that resulted from his

offense.'" *United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023) (quoting *United States v. Igboba*, 964 F.3d 501, 508 (6th Cir. 2020)). "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(B); *see also United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013).

At the sentencing hearing, the district court noted its consideration of the "witness's testimony, the exhibits that were admitted, the investigation that was done in terms of the bank statements, [and] the accounts of the company." The court specifically "g[ave] the defendant the benefit of the doubt" in finding that Crabb had caused a loss of over $250,000.

But Crabb contends that "no argument was presented that the Defendant had an intended loss greater than the actual loss." She seems to suggest that the loss amount was calculated based on uncharged conduct. The sentencing enhancement, however, was applied based on actual losses caused by the fraudulent scheme that Crabb pleaded guilty to. This argument is therefore without merit.

Crabb next argues that, although she "is not maintaining that she provided restitution for stolen funds," the government failed to meet its burden of showing that Crabb did not return the money. She faults the government for failing to investigate her personnel folder, which she claims contains documentation that exonerates her, and for failing to investigate two other individuals employed by Grand Blanc who might have stolen company funds that she is accused of not paying back.

But the government conducted a substantial investigation into Crabb's claims that she had paid back some of the money. The government reviewed Crabb's accounts at various banks, traced checks that she had written to Grand Blanc, and scrutinized electronic-fund transfers that she made to the credit-card companies. It also reviewed Grand Blanc's checking-account records and

deposits for "any checks that were written possibly from Erica Crabb," as well as Crabb's personal payroll account for any potential deductions that she might have taken to pay back Grand Blanc. The district court did not err when it found that this investigation was sufficient to support its finding, by a preponderance of the evidence, that Crabb had not paid back anywhere near the approximately $210,000 required to reduce the loss amount below $250,000.

Finally, Crabb complains that the loss amount was based on broad extrapolation and speculation rather than on transaction-level tracing. But as described in Part A above, the forensic-accounting report produced by Yeo & Yeo, as well as the testimony of the FBI's forensic accountant, belie this contention.

**C. The district court did not err in finding that Crabb used sophisticated means to conceal her fraud, triggering a sentencing enhancement under U.S.S.G. § 2B1.1(b)(10)**

Crabb's final argument is that the district court erred in finding that her offense involved sophisticated means, a finding that supported the application of a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C). "[S]ophisticated means" are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. n.9(B).

As a panel of this court recently noted, we have not yet clarified what standard of review applies to a district court's conclusion that the facts meet the Guideline's definition of "sophisticated means." *See United States v. Karasarides*, 159 F.4th 972, 997–98 (6th Cir. 2025). Past panels have reviewed the district court's conclusion de novo, *United States v. Daulton*, 266 F. App'x 381, 388 (6th Cir. 2008), as well as under the clear-error standard, *United States v. Thomas*, 841 F. App'x 934, 938 (6th Cir. 2021); *United States v. Simmerman*, 850 F.3d 829, 832 (6th Cir. 2017). But we need not resolve this inconsistency here. Regardless of the standard of

review, the district court properly applied the enhancement when it found that Crabb's coverup involved sophisticated means.

Crabb argues that the coverup was simple: she "paid her personal credit with company funds and entered a false entry to conceal it." But her methods in effecting the coverup were in fact far from simple. Crabb was responsible for managing at least ten credit cards for Grand Blanc that she and other employees used for business expenses. Each month, Crabb sent an authorized payment on the credit cards used for business expenses in the exact amount that she paid on the credit-card account that she was using for her personal transactions, presumably so that someone quickly reviewing the payment records might not notice it.

Crabb then made sophisticated false entries in Grand Blanc's accounting systems to conceal these duplicate payments. Sometimes, she would overstate the amount in the accounting software to be paid in payroll by the exact amount of the double payment made on the credit card that she was using for personal expenses or cash advances. She would then send the correct sum to the payroll-processing company for payment to employees. Other times, Crabb would falsely label the second payment in the accounting system as a payment into a retirement account managed by the company Voya.

This court's decision in *United States v. Simmerman*, 850 F.3d 829 (6th Cir. 2017), supports the conclusion that this conduct involved sophisticated means. In *Simmerman*, the defendant stole money from her employer, a credit union, by removing cash from a cabinet referred to as "the vault." *Id.* at 831. Although the act of taking the money out of the vault may have been relatively straightforward, we affirmed the district court's finding that Simmerman used sophisticated means because of how she covered up her crimes.

Simmerman would use a company computer program "to make an entry showing the amount of cash she had removed from the vault had been deposited into another teller's drawer," but the drawer she deposited the stolen funds into was fictitious. *Id.* Because the drawer was not real, the payment "was recorded by default into a 'general ledger suspense account.'" *Id.* at 832. Simmerman would then make "a manual entry suggesting that a transfer from the general ledger suspense account back to the vault had occurred . . . . This ensured that the amount of cash the teller module believed to be in the vault was actually correct, but meant that the general ledger balance would be overstated by the amount of cash she had taken." *Id.* Simmerman then prepared fictitious general-ledger entries to conceal the ledger balance during audits. *Id.*

Here, as in *Simmerman*, Crabb made false and complex accounting entries to make her crimes harder to detect. Instead of trying to distinguish *Simmerman*, Crabb directs our attention to two out-of-circuit district-court cases. She relies on *United States v. Lewis*, 907 F. Supp. 683, 688 (S.D.N.Y. 1995), for the proposition that courts have rejected the sophisticated-means enhancement on the basis of "far more elaborate facts." But Crabb neglects to note that the Second Circuit reversed the district court's rejection of the sophisticated-means enhancement because the tax-evasion scheme was "more complex than the routine tax-evasion case in which a taxpayer reports false information . . . to avoid paying income taxes . . . or asserts he paid taxes that he did not pay." *United States v. Lewis*, 93 F.3d 1075, 1082–83 (2d Cir. 1996) (citations omitted). Here, too, the scheme was "more complex" than merely charging company credit cards for personal expenses and cash advances.

Crabb also analogizes this case to the district-court decision in *United States v. Pangburn*, 467 F. Supp. 3d 1103 (D.N.M. 2020). In *Pangburn*, the defendant manipulated payroll software in order to duplicate salary payments to herself. *Id.* at 1113. The scheme was simple and easy to

detect because the payments were made directly to the defendant and the process "did not use carefully calibrated transaction amounts or payment schedules that would render detection difficult." *Id.* So the court found that the sophisticated-means enhancement did not apply. *Id.* But here, Crabb made payments on credit-card accounts in Grand Blanc's name and carefully calibrated the payment amounts to avoid detection. The factors that the court emphasized in *Pangburn* therefore support applying, not reversing, the sophisticated-means enhancement in this case.

### III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this opinion.