**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Samuel R. GOSS, D.P.M., et al.,**
**Defendants–Appellants.**

No. 02–4022.

United States Court of Appeals,
Sixth Circuit.

April 27, 2004.

Gregory C. Sasse, Asst. U.S. Attorney, U.S. Attorney's Office, Cleveland, OH, for Plaintiff–Appellee.

Dennis G. Terez, Cleveland, OH, for Defendant–Appellant.

Before MERRITT and DAUGHTREY, Circuit Judges; and HOOD,* District Judge.

MERRITT, Circuit Judge.

This case arises from a government investigation into Medicare and Medicaid fraud that utilized a confidential FBI informant named Joseph Beckerman. Beckerman owned a vascular testing lab in the Cleveland area named Cardiac Interpretations, Inc. ("Cardiac") that the FBI had come to suspect of committing Medicare and Medicaid fraud with a core group of Cleveland area doctors. Instead of prosecuting him, the FBI set him up in business as an undercover agent to catch doctors who received kickbacks in return for referring patients to his lab in violation of federal law. The FBI gave Beckerman a budget with which he could pay rent to doctors in exchange for an illegal guarantee of patient referrals. He also used some of the money to pay doctors for referring him to other doctors, and that is how he came into contact with Dr. Samuel Goss, the defendant in this case. Dr. Goss and Beckerman entered into a lease agreement allowing Beckerman to use the common areas of Goss's office on certain days. The written lease agreement was designed to be within the safe harbor provisions of Medicare and Medicaid, but this case turns on whether or not despite the written agreement Goss referred patients for testing in exchange for a payment of rent by Beckerman.

The primary evidence against Goss were conversations he had with Beckerman that, unknown to Goss, were recorded by Beckerman with FBI assistance. During one conversation in mid-January of 1998, Beckerman went to great lengths during the lease negotiations to make sure that he got evidence that Goss understood both that guaranteeing patients was illegal and that their agreement was nevertheless that the rental payments would be in exchange for such a guarantee. After Beckerman read

a passage from the written lease that explained that the rental payments would not be in exchange for any guarantee of patients, the following exchange took place:

Beckerman: So basically what that is saying is we had to put that in there.

Goss: Mmm Hmm.

Beckerman: But you're gonna have to, you know it's, it's illegal for me to come out and tell ya that "you're gonna have to guarantee me patients."

Goss: Right, right.

Beckerman: But, but—you're gonna have to guarantee me patients.

Goss: Right, right, right.

Beckerman: Okay. That's the deal.

Beckerman: ... I mean, uh, you know we can't pay four hundred dollars a month and have, have no patients.

Goss: Patients, right.

Beckerman: Uh, so just, just so you understand we put it in there—this protects, protects—

Goss:—Both sides.

Beckerman: Right.

Goss: Yeah.

Beckerman: But, you know, the guarantee of patients, the, they're—

Goss:—Yeah, it's understood between us.

Beckerman: Right. Right, Okay....

Beckerman: Okay. But it's the big, the big thing with the lease under the Stark laws is that you're not allowed to, uh. Sure, I can rent space, but as a physician you can't guarantee me any patients.

Goss: Mmm Hmm.

Beckerman: But basically this lease covers all that and you're still gonna guarantee me patients.

tucky, sitting by designation.

Goss: Mmm Hmm.

Beckerman then described another physician who guaranteed Beckerman forty or fifty patients a month in exchange for $1.000 in rent. To this end, Beckerman turned to the question of how many patients Dr. Goss might guarantee:

> Beckerman: ... Now, I don't want a doctor to have to guarantee that, but you're gonna have to—I mean, four hundred could, could we see eight patients a month?
>
> Goss: Oh, yeah. From each office?
>
> Beckerman: Well.
>
> Goss: Or what?
>
> Beckerman: I'd like six from each office.
>
> Goss: Okay.

The lease agreements were signed for Goss's Shaker Heights and Akron offices on January 16th. They were for a period of one year, but with a 30–day cancellation clause.

By the end of January, Cardiac had tested no patients referred by Dr. Goss. On January 28, 1998, Beckerman called Goss to ask about patient referrals. Goss advised Beckerman that Cardiac would not have to visit his offices because things had been slow, but said that he thought that patient visits might increase after the end of the month. On February 2, 1998, Beckerman called Goss again to discuss Beckerman's concern that Goss was not referring him enough patients, noting that although Goss had "made an effort" in the half-month since the lease had been signed, Cardiac had not yet tested any of his patients. Beckerman told him he would drop off the $400 rent payment anyway, and asked if "in turn we can try to make something work for this month...." Goss replied, "Oh, we will definitely make something work." On February 6, 1998. Beckerman took the $400 rental payment to Goss' office. In the end. Cardiac tested

only two patients referred by Dr. Goss. Cardiac terminated the lease agreement with Goss in February 1998 after only one payment of $400. Goss claims he told Beckerman that he refused to refer more patients, but Beckerman denies that this conversation ever occurred.

The Ohio grand jury indicted Dr. Goss on four counts of a forty-count indictment accusing three podiatrists of medicare and medicaid fraud. One of the doctors, Dr. Ilodi, who was indicted on thirty-two of the counts, pled guilty to thirty counts and agreed to cooperate against the other two doctors, Dr. Goss and a Dr. Malik. At trial. Dr. Malik was acquitted of all four counts against him. Dr. Goss was acquitted of three of the counts against him, including a charge that he conspired with Beckerman by agreeing to refer patients in return for a kickback, but was found guilty of one count of receiving and soliciting Medicare and Medicaid kickbacks in the amount of $400. The trial court denied Dr. Goss's motion for acquittal. At the sentencing hearing, the trial court declined to give Dr. Goss a two-step downward departure for aberrant behavior, but did assign him two two-step increases, one for obstruction of justice (for perjured testimony) and one for use of a special skill (his medical profession). The trial court sentenced Goss to six months' incarceration and four months of house arrest, both of which he has already served. Dr. Goss now appeals, arguing that he should be acquitted, and that failing that he should receive a downward departure and no level increases. We affirm the conviction and decline to reach the merits of the sentencing issues on the ground that they are now moot.

### Dr. Goss' Motion to Acquit Was Properly Denied

Dr. Goss argues that his motion to acquit should have been upheld because

the lease fell within the safe harbor provisions and because there was insufficient evidence to prove the element of criminal intent. These arguments can be discussed together, since although the written lease may have fallen within the safe harbor provisions, the conviction hinges on whether or not there was sufficient evidence for a reasonable jury to conclude that Dr. Goss referred patients to Beckerman in exchange for the payment of rent notwithstanding the written terms of the lease.

The relevant section of the statute, 42 U.S.C. § 1320a–7b(b), criminalizes referring patients "in return for" a kickback, as follows:

> (b) Illegal remunerations
>
>> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in case or in kind—
>>
>>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program....

It is clear that although doctors can receive rental payments from companies like Cardiac, they cannot do so in exchange for a guarantee of patient referrals.

Dr. Goss argues, as he did at trial, that in the conversation with Beckerman above he did not mean to guarantee to refer a certain number of patients. Instead, he argued variously that he meant only to guarantee to refer to the $400 rental payment, or to refer only patients who needed treatment, or that he did not mean to make any guarantees at all. As evidence he emphasizes that only two patients whom he referred to Cardiac ever had tests performed.

Whatever the jury may have believed concerning the government's contention that Goss made an oral agreement with Beckerman to refer patients in return for rent, it is clear that they believed that Goss received the rent and referred two patients "in return" therefor. Goss admits receiving the money and admits referring the patients. The evidence that the two were connected and that Goss intended to provide the referrals as a *quid pro quo* is certainly sufficient to allow the jury to find a violation of the statute. The conversation between Beckerman and Goss on February 2nd is more evidence that the referrals were in exchange for the $400 rental payment. At the very most all Dr. Goss shows is that a reasonable jury might have acquitted based on his explanation. But what this Court is faced with in addressing the trial court's denial of Goss' motion to acquit is the question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir.1996) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)). Dr. Goss had a trial before a jury of his peers who heard his interpretation of the conversations and convicted him nonetheless.

### Dr. Goss's Objections to the Sentencing Calculation Are Now Moot

■ Dr. Goss raises questions about the district court's decisions not to depart downward for aberrant behavior and to apply a two-level enhancement for obstruction of justice and a two-level enhancement for use of a special skill. We have serious doubts about both enhancements. The special skill enhancement does not apply when "an abuse of trust or skill is included in the base offense level or specific offense

characteristic." U.S.S.G. § 3B1.1. The statute criminalizes the referring of patients in return for money, and it may be the case that such referrals could only be accomplished by defendants who have the special skills associated with the medical profession. It is also questionable whether the jury necessarily believed Goss lied (as the district court stated) when he testified that he did not make an agreement with Beckerman in advance to guarantee patients (after all, the jury acquitted him of this charge in the conspiracy count). As noted in the Sentencing Commission's Commentary to the guidelines, the obstruction of justice enhancement "is not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. § 3C.1.1 app. n. 2; *see also United States v. Crousore,* 1 F.3d 382, 385 (6th Cir.1993) (holding that in perjury determinations "allegedly false statements should be evaluated in a light most favorable to the defendant."). However, because Goss has now served his sentence of six months of incarceration and four months of house arrest, his objections to the sentencing calculation are now moot. *See United States v. Isong,* 111 F.3d 41, 42 (6th Cir. 1997) (holding that the issue of the length of a defendant's consecutive sentences was moot because the defendant had served both sentences).

For the reasons stated above, we AFFIRM the conviction and decline to reach the sentencing issues.