NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0467n.06

Case No. 19-1748

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | | **FILED**<br>Aug 06, 2020<br>DEBORAH S. HUNT, Clerk |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| SOPHIA EGGLESTON, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

_____

Before:  GUY, BOGGS, and WHITE, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.**  A jury convicted defendant Sophia Eggleston on three counts involving a healthcare kickback scheme.  The district court sentenced her to a prison term and ordered her to pay approximately $2 million in forfeiture and restitution.  She appeals, arguing that the district court improperly kept her from presenting a valid defense and erred at sentencing.  We affirm.

**I.**

If a Medicare beneficiary is homebound, Medicare will pay for that person's treatments to occur at home, provided certain requirements are met.  The patient chooses who will provide the home care and often that ends up being a home health agency—a company that coordinates the patient's care and sends nurses, therapists, and other care providers to the patient's home.  In

situations like these, the home health agency is the one that bills Medicare for the services provided.

Prestige Home Health Services and Empirical Home Health Care were two such home health agencies.[1] But their owners—Muhammad Aamier and Usman Butt—used the agencies to defraud Medicare. The scheme was straightforward. They looked for people whom they could sign up as homebound patients, even if those people did not truly need or qualify for home care. Then, with the help of dishonest doctors, Aamier and Butt found ways to bill various unnecessary services to Medicare, pocketing money when the bills were paid.

Aamier and Butt paid recruiters to seek out and sign up new patients. They testified that it was solely a fee-based compensation. Once the agency started billing Medicare for a new patient, the recruiter who brought that person in would receive a fee for each patient: $700 initially, and later $1,100. (PageID 1671.) Herein lay the trouble for the recruiters, for federal law forbids anyone from knowingly and willfully receiving "any remuneration . . . directly or indirectly . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(1)(A).

Eggleston entered the picture in 2009 when Aamier got in touch with her. Prior to their meeting, Eggleston worked independently as a "community liaison," which, according to her testimony, meant helping seniors in various ways without compensation. (PageID 2110–11.) She testified that Aamier and another man reached out to her and offered to pay her to work for the agencies as a community liaison. (PageID 2112–13, 2124.) According to Eggleston, she received $65 per hour, paid by check and accompanied by 1099 forms. (PageID 2112–13.) Aamier testified

---

[1] For purposes of this appeal, we refer to them generically as "the agencies."

that they used the terms "recruiter" and "community liaison" interchangeably, but contrary to Eggleston's testimony, he said they paid her on a per-patient basis, which he and she both knew was illegal. (PageID 1646–47, 1654, 2018–19, 2155.)

Eventually Aamier and Butt were caught and entered guilty pleas in exchange for testifying against Eggleston. In their telling, Eggleston was an "aggressive" recruiter who formed the "backbone" of the agencies and negotiated her way to a higher per-patient fee. (PageID 1656, 2028, 2044–46.) By the government's tally, over the course of five years, Eggleston received $507,000 for her work as a recruiter.

Eggleston disputed all of that, insisting that she was paid at an hourly rate to do honest work helping qualified patients receive treatment at home. So she planned to rely on a "safe harbor defense" at her trial. By way of background, the anti-kickback provision Eggleston was charged with violating contains an exception: the bar against remuneration for referrals does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services[.]" 42 U.S.C. § 1320a-7b(b)(3)(B). To satisfy that provision, Eggleston intended to offer evidence that she was paid by the hour and that the patients she worked with were truly eligible for home care and received medically necessary treatment.

When the government learned of Eggleston's planned defense, it filed a motion *in limine* to preclude her "from referencing the safe harbor provisions, including in *voir dire* and her opening statement and closing argument, and from introducing evidence to establish such a defense[.]" (PageID 848.) The court ruled that she could not mention the defense in her opening statement, but reserved any other ruling on the matter until after evidence came in. (PageID 1005, 1870–72.) In a related vein, the government expressed concern that Eggleston would call former patients as

witnesses in an effort to demonstrate her prior good conduct. (PageID 1872.) The court ruled that Eggleston could not elicit testimony merely for the purpose of showing that the patients received necessary treatment, but if she "need[ed] it for safe harbor or for any other reason, absolutely" she could introduce it. (PageID 1873.)

The case went to trial. During the government's case in chief, it put on two former patients as witnesses: Loretta Hodge and Eugene Jones. Eggleston's cross-examinations of them were both very brief. Her attorney asked about the treatment Hodge received and whether it helped her. (PageID 1996.) Hodge confirmed that it did help. (PageID 1996.) Jones was likewise asked about his treatment and whether Eggleston ever asked him to do anything improper. (PageID 2002–03.) Jones confirmed that Eggleston did not. (PageID 2003.) Neither the court nor the government objected or interjected at any point. For her part, Eggleston chose to put on only two witnesses: herself and Jimmy Tucker, a former patient.[2] Eggleston's attorney did not attempt to ask Tucker any questions relating to the safe-harbor defense and the court did not keep counsel from questioning him about the treatment he received. (PageID 2076–2102.)

Prior to trial, Eggleston and the government gave the court "Joint Jury Instructions." These did not contain any mention of the safe-harbor defense. At the close of evidence, the court discussed which of these it would give, and then mentioned on its own that "[t]he Court will not give the safe harbor. I don't think it's appropriate at this point to give it and so I'm not going to give it." (PageID 2180–85.) In the court's view, the only evidence introduced on that score was Eggleston's contention that she was an hourly employee, "nothing else." (PageID 2186.) Eggleston did not object, the other instructions were given, and the jury convicted Eggleston.

---

[2] Eggleston made a belated attempted to adjourn the trial so that she could put on a third, non-patient witness, a Dr. Dumitri, but the court denied the request. She does not challenge that ruling now.

## II.

Eggleston raises five arguments on appeal. First, she asserts that the district court erroneously precluded her from introducing evidence supporting a safe-harbor defense. Second, and relatedly, the court erred by refusing to give a safe-harbor jury instruction. Third, the court should not have imposed restitution jointly and severally in the way that it did. Fourth, the ordered restitution and forfeiture were based on improper judicial fact finding. And fifth, the court erroneously applied sentencing enhancements.

### A.      Excluded Evidence

We review evidentiary rulings for abuse of discretion, meaning that we consider whether the district court made clearly erroneous findings of fact, improperly applied the law, or used an erroneous legal standard in making its decision. *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006). That review is limited in this case because Eggleston has not identified specific evidence that the district court kept her from introducing. In her briefing before this court, she asserts that the district court granted the government's motion, which asked the court to preclude her from presenting evidence that "the Medicare beneficiaries that she recruited or worked with: a) qualified for home health services; b) received necessary home health services; or c) were not paid to receive services." (Appellant Br. 15.)

As already noted, however, the court did not flatly grant the motion. In an on-the-record discussion, the court made clear that Eggleston could "absolutely" present testimony from former patients to bolster her safe-harbor defense. (PageID 1873.) Yet when the time came, Eggleston did not call those witnesses. Had she done so, and the government objected, the district court might have faced "draw[ing] impossibly fine distinctions between safe harbor evidence" and impermissible character evidence. *United States v. Ekwebelem*, No. CR-12-01170-MWF, 2014

WL 12633529, at *2 (C.D. Cal. Sept. 9, 2014) (order). But it never came to that. Nor was Eggleston impeded in questioning the witnesses who did testify.

Consequently, the only decision for us to review is the district court's more general ruling that Eggleston could not put on witnesses "for the mere purpose of saying that they received the treatment and . . . the treatment was required." (PageID 1873.) This ruling was not an abuse of discretion. Such testimony, unconnected to a safe-harbor or other argument, would not have tended to make a fact of consequence more or less probable, and thus been inadmissible. *See* Fed. R. Evid. 401, 402. The crime at issue makes no distinction between kickbacks earned from medically necessary services and those earned from unnecessary ones. *See* 42 U.S.C. § 1320a-7b(b)(1)(A); *See also United States v.* Goss, 96 F. App'x 365, 368 (6th Cir. 2004) (affirming conviction under § 1320a-7b(b)(1)(A) as "evidence that [the doctor] intended to provide the referrals as a quid pro quo is certainly sufficient to allow the jury to find a violation of the statute"). To the contrary, evidence from patients praising Eggleston for helping them get necessary services, albeit illegally, might run the risk of currying jury sympathy with no countervailing probative value. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury[.]"); *cf. United States v. Marlinga*, 457 F. Supp. 2d 769, 776 (E.D. Mich. 2006) (permitting potentially prejudicial evidence because of its probative value in disproving an element of the charged offenses).

Eggleston makes a related argument that the district court deprived her of a meaningful opportunity to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (recognizing that the Sixth and Fourteenth Amendments require an "opportunity to be heard"). When "evidentiary issues relate to a claimed violation of the Sixth Amendment, the de novo

standard of review applies." *United States v. Cunningham*, 679 F.3d 355, 382 (6th Cir. 2012) (quotation marks and citation omitted). Our conclusion, however, is no different when considered from this angle. The fact remains that the court did not keep Eggleston from presenting the evidence she now complains about. As just explained, the court's general ruling—which explicitly allowed Eggleston to offer the evidence if using it to support a safe-harbor defense—had a sensible basis. It was ex ante guidance that was neither arbitrary nor disproportionate to the purposes that the rules of evidence are designed to serve. *See Holmes v. South Carolina*, 547 U.S. 319, 324–25 (2006).

### B.     Jury Instruction

Eggleston next contends that the district court abused its discretion when it "refused" to instruct the jury on the safe-harbor defense. (Appellant Br. 24.) It bears noting, however, that Eggleston never asked for such an instruction. She and the government jointly proposed instructions that did not include a safe-harbor instruction. While reviewing the proposed instructions, the court directly asked Eggleston's counsel if there was anything else needed, and counsel replied, "That's it." (PageID 2180–85.) It was only after this that the court, on its own, mentioned that it would not give a safe-harbor instruction because there was not evidence to support it. (PageID 2186.) Eggleston did not object at that point, either. Consequently, the proper standard of review would seem to be for plain error, not abuse of discretion. *United States v. Morrow*, 977 F.2d 222, 226 (6th Cir. 1992). Ultimately, though, the result is the same under either standard.

Eggleston urges us to do as we did in *United States v. Tarwater* and consider three factors which, if met, amount to abuse of discretion:

(1) the requested instruction is a correct statement of the law;

(2) the requested instruction is not substantially covered by other instructions actually delivered; and

(3) the failure to give the requested instruction impairs the defendant's theory of the case.

*United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002). But because Eggleston never asked for an instruction, there is no "requested instruction" for us to evaluate. What we do have is the district court's stated reason for not giving a safe-harbor instruction: the lack of evidence to support that defense. Generally speaking, that is a permissible basis for refusing to give an instruction. *See Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 736 (6th Cir. 1995). We will therefore consider whether, in light of the evidence, not giving the instruction on that basis was an abuse of discretion. *Cf. United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976) (recognizing that while a trial court need not "adopt the language suggested by a defendant" concerning a defense theory, the defendant is still "entitled to some mention of that theory in the instructions" if the theory "finds some support in the evidence and in the law").

The safe-harbor provision is narrow. The statute's overarching prohibition applies to anyone who:

knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(1)(A). But under the safe harbor, that paragraph does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services[.]" 42 U.S.C. § 1320a-7b(b)(3)(A). So for the safe harbor to apply to Eggleston, she had to show that (1) she

was in "a bona fide employment relationship" with Prestige, and (2) the specific money she was charged with receiving was paid to her as part of her bona fide employment.

Both parties suggest that bona fide employment in this case should be measured by three factors: (1) Prestige's control over Eggleston's work hours, (2) whether Eggleston's work was part of Prestige's regular business, and (3) the manner of Eggleston's payment. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992). The government says that even if the jury was instructed on this matter, there was not enough evidence for it to find that Eggleston was a bona fide employee. Eggleston says that there was enough evidence.

We agree with the government. Eggleston's own testimony made clear that Prestige exercised little to no control over how she went about her work. In her telling, she worked 16 to 18 hours each day, but seldom went into Prestige's office except to pick up a check or attend an occasional meeting. When asked how often she went to meetings, she replied, "Well, if they had four in a month, I probably got [to] three of them and was late for the fourth one if I wasn't doing nothing . . . [b]ecause I needed to complain about who wasn't doing what they were supposed to do." (PageID 2125.) According to Eggleston, her work for the agencies was merely an extension of what she previously did on her own, for free. (PageID 2110–13.) She turned in time sheets, but was issued 1099s, rather than W-2s. (PageID 2113, 2124.) And when she got paid, it did not match up with the hours she claimed to have worked. Rather than varying week to week, Eggleston was consistently paid in increments of $1,100—precisely the per-patient fee testified to by Aamier.[3] (PageID 1671.) When confronted about this, Eggleston simply insisted that she was

---

[3] Eggleston was specifically charged with two counts of receiving kickbacks and, for each count, the verdict form specifically identified the check used to pay Eggleston the kickback. One of the checks was for $5,500, the other was for $7,700. (PageID 1798.) There was also evidence that Eggleston received 30 checks over nine months, and each one was in a multiple of $1,100. (PageID 2165–66.)

truly paid hourly rates of $65 and $125 per hour, but Prestige regularly underpaid her due to cash flow problems, resulting in the $1,100-increment payments.  (PageID 2165–70.)

In the face of all this, the district court permissibly concluded that there was not enough evidence to justify giving the jury a safe-harbor instruction.  *See, e.g.*, *Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.").

## C.     Restitution

By law, the district court was required to order Eggleston to pay restitution to the victim of her offenses:  the United States Department of Health and Human Services. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).   The probation department calculated the amount of restitution as $1,492,631.79, which was the total amount paid by Medicare to the agencies for the beneficiaries (i.e., patients) whom Eggleston recruited.  The government endorsed that amount of restitution in its sentencing memorandum while Eggleston's memorandum did not mention restitution one way or another.  There was no dispute about the restitution at the sentencing hearing either, so the court held Eggleston responsible for that full amount, jointly and severally with eight other people.  (PageID 1846, 1562–63.)  One of them was a co-defendant with Eggleston, under case number 14-20589.  (PageID 1562–63.)  The other seven were defendants in case number 13-20039.  Aamier and Butt were two of those seven.

Now on appeal, Eggleston argues that the district court erred by imposing the restitution jointly and severally among defendants from another case.  Eggleston reads 18 U.S.C. § 3664(h) to forbid joint-and-several restitution that goes beyond the defendants charged in a single case or indictment.  And she insists that we reached that same conclusion in an unpublished decision,

*United States v. McGlown*, 380 F. App'x 487, 491 (6th Cir. 2010). Eggleston admits that her failure to raise this objection at sentencing means we review only for plain error, *see United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004), but she nevertheless contends that imposing restitution in this way was such an error.

We disagree. An error is "plain" only if, among other things, it "is clear under current law." *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). A circuit split or a "lack of binding case law" precludes plain error. *Id.* The circuits are not clearly in accord on this matter and the case from our own circuit is neither binding nor on point.

Start with our decision in *McGlown*, where a single defendant was charged with crimes arising from making counterfeit checks. After he was ordered to pay restitution, he complained on appeal that others had been involved in the scheme too, and thus the sentencing court abused its discretion by ordering him to pay the full amount. 380 F. App'x at 491. The defendant relied on 18 U.S.C. § 3664(h), but we observed that the provision was inapplicable because the defendant "was the only person charged in the indictment," and § 3664(h) "addresses situations where 'the district court finds that more than 1 ***defendant*** has contributed to the loss of a victim[.]'" *Id.* at 491 (quoting 18 U.S.C. § 3664(h) but adding emphasis).

Eggleston's case is different. Although seven of the people with whom she shares liability were not defendants in her case, they were indicted and convicted defendants in another case. That case involved the same home health agencies, the same type of crime, the same co-conspirators, and was overseen by the same judge. (E.D. Mich., Case No. 2:13-cr-20039-BAF-MKM, R.3, PageID 7–8.) This overlap led the court to treat the two as companion cases. *See* E.D. Mich.

Local Crim. R. 57.10(b)(4). (PageID 12.) Roping Eggleston in with these defendants is different from the *McGlown* defendant's attempt to place blame on unindicted persons.

Eggleston's case is also distinguishable from the out-of-circuit cases she cites in her briefing. Those cases dealt with the common problem of apportioning restitution in child pornography cases, where there is typically one defendant in a stand-alone case, but the extent of the harm—and who has caused it—is open-ended, unknowable, and extends far beyond the forum jurisdiction. *See, e.g.*, *United States v. Laraneta*, 700 F.3d 983, 992–93 (7th Cir. 2012); *United States v. Aumais*, 656 F.3d 147, 156 (2d Cir. 2011). That is not the case here, where there is one victim owed restitution and a known group of other defendants in a companion case. The separate cases might pose a problem if there were a bright-line rule that § 3664(h) always requires that the defendants be "charged under the same indictment." *Paroline v. United States*, 572 U.S. 434, 466, n.1 (2014) (Roberts, C.J., dissenting). But Eggleston has not provided us with binding precedent drawing that line. In fact, post-*Paroline,* the Third Circuit permitted joint and several liability under facts very similar to those here. *See United States v. Kolodesh*, 787 F.3d 224, 242–43 (3d Cir. 2015) ((upholding joint and several liability across multiple cases involving a home-healthcare kickback scheme) (*see* Brief of Appellant in *Kolodesh*, No. 14-2904, 2014 WL 5427542, at \*66 for greater detail)). In light of all this, the district court's decision cannot be considered plain error.

D.      Forfeiture

In addition to restitution, the district court ordered forfeiture of $511,436, which the government contended was the amount she personally received in kickbacks from the agencies. (PageID 1564.) The jury did not make findings on this score, so Eggleston argues that the district

court made impermissible findings of fact. This is the first time Eggleston has made this argument, so once again plain-error review applies.

Two Supreme Court cases form the basis of Eggleston's argument. In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The Court subsequently held that when a criminal fine is substantial enough to trigger the Sixth Amendment right to a jury trial, "*Apprendi* applies in full." *S. Union Co. v. United States*, 567 U.S. 343, 352 (2012). Eggleston contends that, under the holding in *Southern Union*, a restitution order must likewise be supported by jury findings, rather than judicial findings.

We have not resolved that exact question, but other circuits have, and they have uniformly rejected Eggleston's argument. s*United States v. Phillips*, 704 F.3d 754, 770 (9th Cir. 2012). Those courts have reasoned that (1) forfeiture is not a fine and (2) there is no maximum for forfeitures, making *Apprendi* and *Southern Union* inapplicable. *Id.*; *see also United States v. Sawyer*, 825 F.3d 287, 297 (6th Cir. 2016) (applying the same rationale to restitution orders).[4] Against this backdrop, we cannot say that the district court plainly erred in entering the forfeiture order.

### E. Sentencing Enhancements

Eggleston's final argument is about two sentencing enhancements she received. The probation department's presentence report recommended increasing her offense level by two because Eggleston "knew or should have known that a victim of the offense was a vulnerable

---

[4] Eggleston also made an *Apprendi*/*Southern Union* argument about the restitution she was ordered to pay, but rightly conceded that, in light of *Sawyer*, the panel could not grant her relief. (Appellant Br. 34.)

victim[.]" USSG § 3A1.1(b)(1). (PSR, ¶ 25.) And it recommended an additional four-point enhancement because she "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" USSG § 3B1.1(a). (PSR, ¶ 26.) Eggleston's short sentencing memorandum did not mention either of these enhancements. To the contrary, the memorandum stated, "the scoring is not in dispute." (PageID 1446.) Although it included a brief remark that "[t]here is no evidence of a leadership role by [Eggleston]," this was in the context of discussing the general sentencing factors under 18 U.S.C. § 3553. (PageID 1449.) And Eggleston did not address either enhancement at the sentencing hearing. Eggleston's course of conduct means her enhancement arguments are likely waived. *See United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). Nevertheless, even if her enhancement arguments are considered forfeited rather than waived, Eggleston has not shown that the district court plainly erred by applying either enhancement.

Under USSG § 3A1.1(b)(1), a two-level enhancement applies if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." The Guidelines define a vulnerable victim as a person "who is a victim of the offense of conviction and any [relevant] conduct" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." USSG § 3A1.1(b)(1), cmt. n.2. On appeal, Eggleston contends that the district court erred by including as victims the individual patients she referred. In her view, "[t]he law makes clear that the Medicare program, not the individual referees, is the relevant victim." (Appellant Br. at 48.) Although we do not appear to have addressed this question, other circuits have rejected Eggleston's argument. *See, e.g.*, *United States v. Bergman*, 852 F.3d 1046, 1072 (11th Cir. 2017) (concluding in a Medicare fraud case that the patients of the fraudulent scheme qualified as vulnerable victims for purposes of the enhancement);

*United States v. Rehfuss*, 810 F. App'x 92, 94 (3d Cir. 2020) (affirming application of the enhancement where district court counted Medicare participants as victims "even though only Medicare suffered financial harm"). The lack of binding Sixth Circuit case law and other circuits' rejection of Eggleston's argument means that the district court did not plainly err in applying the enhancement.

Eggleston also argues that the district court improperly assessed a four-level aggravating-role enhancement under USSG § 3B1.1(a) because her "lack of participation in the design of the scheme, lack of control over other participants, and the non-critical nature of her role all indicate that [she] was not a leader." (Appellant Br. at 43.) We disagree. The government proved that Eggleston recruited several members of the fraudulent scheme, often exercised control over other participants—including Aamier, Butt and Dr. Agomuoh—and played a central role in the success of the fraudulent scheme. We have upheld the enhancement in similar cases. *See, e.g.*, *United States v. Mahmud*, 541 F. App'x 630, 636–37 (6th Cir. 2013) (applying enhancement in healthcare fraud scheme where the defendant recruited accomplices and directed other participants). The district court did not plainly err in imposing this enhancement.

**III.**

The judgment of the district court is **AFFIRMED**.